713 A.2d 390

KATHLEEN CESARE, PLAINTIFF–APPELLANT, v. RICHARD
CESARE, DEFENDANT–RESPONDENT.

Argued March 16, 1998—Decided June 3, 1998.

*Laura K. Abel,* argued the cause for plaintiff appellant (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Ms. Abel* and *Lawrence S. Lustberg,* on the brief).

*Dorothy L. Wright,* argued the cause for respondent (*Ms. Wright,* attorney; *Donald W. Stieh,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal involves a domestic violence dispute and the interpretation of the Prevention of Domestic Violence Act, *N.J.S.A.* 2C:25–17 to –33 ("Act" or "DVA"). Specifically, this case concerns the standard of appellate review that should be applied and the role a past history of abuse should play under the Act in evaluating a domestic violence complaint that alleges terroristic threats and harassment. The trial court found that defendant's conduct violated the Domestic Violence Act and determined that cause existed to issue a restraining order. The Appellate Division reversed, concluding that the trial court's decision constituted a "manifest denial of justice." *Cesare v. Cesare,* 302 *N.J.Super.* 57, 64, 694 *A.*2d 603 (1997). We granted plaintiff's petition for certification, 152 *N.J.* 9, 702 *A.*2d 348 (1997), and now reverse.

I.

A.

Domestic violence is a serious problem in our society. Described as a "pattern of abusive and controlling behavior injurious to its victims," *Peranio v. Peranio,* 280 *N.J.Super.* 47, 52, 654 *A.*2d 495 (App.Div.1995); *accord Corrente v. Corrente,* 281 *N.J.Super.* 243, 246, 657 *A.*2d 440 (App.Div.1995), domestic violence "persists as a grave threat to the family, particularly to women and

children." *State v. Chenique–Puey*, 145 *N.J.* 334, 340, 678 *A.*2d 694 (1996). Studies show that between three and four million women each year, from all socio-economic classes, races, and religions, are battered by husbands, partners, and boyfriends. *Brennan v. Orban, Jr.*, 145 *N.J.* 282, 299, 678 *A.*2d 667 (1996) (citations omitted); *see also* William G. Bassler, *The Federalization of Domestic Violence: An Exercise in Cooperative Federalism or a Misallocation of Federal Judicial Resources?*, 48 *Rutgers L.Rev.* 1139, 1140 (1996) ("No class, religion or race is immune.").

The domestic violence epidemic has also hit New Jersey. In 1993, 66,000 cases of domestic violence were reported, a 27% increase over 1992. Preamble, *L.* 1994, *Joint Resolution No. 2, reprinted at N.J.S.A.* 2C:25–17. In 1996, 85,018 domestic violence offenses were reported in New Jersey and women were victims in 80% of those offenses. Department of Law and Public Safety, *Fourteenth Annual Domestic Violence Offense Report* (1996). In enacting the DVA, the Legislature declared:

> [T]here are thousands of persons in this State who are regularly beaten, tortured and in some cases even killed by their spouses or cohabitants; that a significant number of women who are assaulted are pregnant; that victims of domestic violence come from all social and economic backgrounds and ethnic groups; that there is a positive correlation between spousal abuse and child abuse; and that children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence.
>
> [*N.J.S.A.* 2C:25–18.]

Until recently, however, the law in New Jersey did not take seriously the plight of abused and battered women. "Perhaps as a result of custom, practice, societal mores or other inappropriate reasons, in the past, victims of domestic violence were not adequately protected by the police, the courts, or society as a whole." *Sperling v. Teplitsky*, 294 *N.J.Super.* 312, 318, 683 *A.*2d 244 (Ch.Div.1996). As noted by the Legislature in its findings, domestic violence victims received "different treatment from similar crimes when they occur[ed] in a domestic context," and experienced "substantial difficulty in gaining access to protection from the judicial system, particularly due to that system's inability to

generate a prompt response in an emergency situation." *N.J.S.A.* 2C:25–18. The Legislature enacted the Prevention of Domestic Violence Act in response to that situation. *See Sperling, supra,* 294 *N.J.Super.* at 320, 683 *A.*2d 244 (finding that Legislature, in adopting the Act, "sought to redress a perceived wrong").

The Domestic Violence Act was intended "to assure the victims of domestic violence the *maximum protection* from abuse the law can provide." *N.J.S.A.* 2C:25–18 (emphasis added). The Legislature attempted to address the problem comprehensively by requiring an immediate response when an offense is suspected, by mandating training for judges as well as court and law enforcement personnel, and by demanding uniformity in the prosecution and adjudication of claims. *See N.J.S.A.* 2C:25–18; Preamble, *L.*1994, *Joint Resolution No. 2, reprinted at N.J.S.A.* 2C:25–17; *D.C. v. F.R.,* 286 *N.J.Super.* 589, 597, 670 *A.*2d 51 (App.Div.1996); *N.J.S.A.* 2C:25–20. The legislative findings underlying the Domestic Violence Act assert:

It is the intent of the Legislature to stress that the primary duty of a law enforcement officer when responding to a domestic violence call is to enforce the laws allegedly violated and to protect the victim.... It is further intended that the official response to domestic violence shall communicate the attitude that violent behavior will not be excused or tolerated, and shall make clear the fact that the ... [A]ct will be enforced without regard to the fact that the violence grows out of a domestic situation.

[*N.J.S.A.* 2C:25–18.]

Most importantly, the law was meant to "ensure[ ] that spouses who were subjected to criminal conduct by their mates had full access to the protections of the legal system." *Corrente, supra,* 281 *N.J.Super.* at 248, 657 *A.*2d 440; *Peranio, supra,* 280 *N.J.Super.* at 54, 654 *A.*2d 495.

To reach those goals, the Act provides both emergency and long-term civil and criminal remedies and sanctions and encourages the "broad application" of those remedies in the courts of this State. *N.J.S.A.* 2C:25–18. In the criminal context, an abuser may be subject to arrest upon probable cause and, depending on the existence of various conditions, the seizure of any dangerous weapons he possesses and the revocation of any licenses or

permits for the use, possession, or ownership of those weapons. *N.J.S.A.* 2C:25–21. In the civil context at issue here, the Act permits victims to file a complaint alleging the commission of an act of domestic violence and to seek emergency *ex parte* relief. *N.J.S.A.* 2C:25–28. If a victim proves by a preponderance of the evidence, at a hearing in the Family Part held within ten days of the filing of the complaint, that the accused committed an act of domestic violence, or if the accused admits to committing such an act, the court may then "grant any relief necessary to prevent further abuse." *N.J.S.A.* 2C:25–29. Among the remedies provided are: the exclusion of the defendant from the marital premises; visitation orders or suspension of visitation; monetary compensation for losses suffered payable by the defendant; mandatory counseling for defendant; a grant of temporary custody; an order restraining the defendant from making contact with the plaintiff; and the prohibition of defendant from possessing any firearms or certain other weapons. *N.J.S.A.* 2C:25–29.

■ The Act and its legislative history confirm that New Jersey has a strong policy against domestic violence. *See In re Principato,* 139 *N.J.* 456, 463, 655 *A.*2d 920 (1995); *see also State v. Hoffman,* 149 *N.J.* 564, 584, 695 *A.*2d 236 (1997) ("Our law is particularly solicitous of victims of domestic violence...."). Because the Domestic Violence Act is remedial in nature, it is to be liberally construed to achieve its salutary purposes. *See Young v. Schering Corp.,* 141 *N.J.* 16, 25, 660 *A.*2d 1153 (1995); *J.N. v. D.S.,* 300 *N.J.Super.* 647, 651, 693 *A.*2d 571 (Ch.Div.1996).

### B.

To subject a defendant to one of the remedies discussed above, a plaintiff must first prove that the defendant committed an act of domestic violence, as defined by the statute. *N.J.S.A.* 2C:25–29(a). *N.J.S.A.* 2C:25–19(a) specifically defines domestic violence. That section provides:

"Domestic violence" means the occurrence of one or more of the following acts inflicted upon a person protected under this act by an adult or an emancipated minor:

. . .

(3) Terroristic threats, *N.J.S.* 2C:12–3

. . .

(13) Harassment, *N.J.S.* 2C:33–4 1
[*N.J.S.A.* 2C:25–19(a).]

As observed by the courts in *Corrente, supra*, and *Peranio, supra*, "[i]n enacting the domestic violence law, the Legislature did not create a new class of offenses or interdict acts which otherwise were not addressed by the criminal law." 281 *N.J.Super.* at 248, 657 *A.2d* 440, 280 *N.J.Super.* at 54, 654 *A.2d* 495. Rather, the Act incorporates a variety of criminal statutes into its civil and criminal framework.

In the civil context, a court must determine by a preponderance of the evidence whether an act of terroristic threats or harassment, or any other listed prohibited conduct, has been committed. *N.J.S.A.* 2C:25–19(a), –29(a). The Act further provides:

The court shall consider but not be limited to the following factors:

(1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;

(2) The existence of immediate danger to person or property;

(3) The financial circumstances of the plaintiff and defendant;

(4) The best interests of the victim and any child;

(5) In determining custody and visitation the protection of the victim's safety; and

(6) The existence of a verifiable order of protection from another jurisdiction.
[*N.J.S.A.* 2C:25–29(a).]

Because some of the above factors, such as the financial circumstances of the parties and the best interests of the child, are relevant only to the fashioning of a domestic violence remedy, *N.J.S.A.* 2C:25–29(a) does not mandate that a trial court incorpo-

---

1 *N.J.S.A.* 2C:25–19(a) also lists the following as additional examples of prohibited conduct: Homicide; Assault; Kidnapping, Criminal Restraint; False Imprisonment; Sexual Assault; Criminal Sexual Conduct; Lewdness; Criminal Mischief; Burglary; and Criminal Trespass. However, none of those actions are relevant to the present case.

rate all of those factors into its findings when determining whether or not an act of domestic violence has been committed. However, the Act does require that "acts claimed by a plaintiff to be domestic violence ... be evaluated in light of the previous history of violence between the parties." *Peranio, supra,* 280 *N.J.Super.* at 54, 654 *A.*2d 495; *accord Corrente, supra,* 281 *N.J.Super.* at 248, 657 *A.*2d 440. Although a court is *not obligated to find* a past history of abuse before determining that an act of domestic violence has been committed in a particular situation, a court must at least *consider* that factor in the course of its analysis. Therefore, not only may one sufficiently egregious action constitute domestic violence under the Act, even with no history of abuse between the parties, but a court may also determine that an ambiguous incident qualifies as prohibited conduct, based on a finding of violence in the parties' past.

## C.

The need to consider a plaintiff's history of abuse in evaluating a domestic violence complaint is consistent with the requirements of the two listed crimes at issue in this case— terroristic threats and harassment. The crime of terroristic threats, a third degree offense, is committed when a person "threatens to kill another with purpose to put him in imminent fear of death under circumstances reasonably causing the victim to believe the immediacy of the threat and the likelihood that it will be carried out." *N.J.S.A.* 2C:12–3(b). Proof of terroristic threats must be measured by an objective standard. *State v. Smith,* 262 *N.J.Super.* 487, 515, 621 *A.*2d 493 (App.Div.), *certif. denied,* 134 *N.J.* 476, 634 *A.*2d 523 (1993); *see also State v. Kaufman,* 118 *N.J.Super.* 472, 474, 288 *A.*2d 581 (App.Div.) (interpreting former statute), *certif. denied,* 60 *N.J.* 467, 291 *A.*2d 17 (1972). The pertinent requirements are whether: (1) the defendant in fact threatened the plaintiff; (2) the defendant intended to so threaten the plaintiff; and (3) a reasonable person would have believed the threat. *See Smith, supra,* 262 *N.J.Super.* at 516, 621 *A.*2d 493.

The court in *State v. Butterfoss*, 234 *N.J.Super.* 606, 612, 561 *A.*2d 312 (Law Div.1988), relied on by the Appellate Division, 302 *N.J.Super.* at 65, 694 *A.*2d 603, stated that "whether [the defendant] intended to carry out the threat or whether the fear of the victim was actually induced are immaterial considerations." That same principle was also espoused in *State v. Nolan*, 205 *N.J.Super.* 1, 4, 500 *A.*2d 1 (App.Div.1985). The court there stated:

[W]e do not construe the statute as requiring proof that the victim actually feared death or was under the apprehension that he was about to be killed. Some people are braver than others and less likely to be subject to intimidation. The criminality of the perpetrator's conduct should not depend on the courage or timidity of the intended victim. In our view, the statute merely requires that the threat be made under circumstances under which it carries the serious promise of death.

[*Ibid.*]

■■■ Although we agree that, under an objective standard, courts should not consider the victim's actual fear, courts must still consider a plaintiff's individual circumstances and background in determining whether a reasonable person in that situation would have believed the defendant's threat. *See State v. Milano*, 167 *N.J.Super.* 318, 323, 400 *A.*2d 854 (Law Div.1979), *aff'd*, 172 *N.J.Super.* 361, 412 *A.*2d 129 (App.Div.), *certif. denied*, 84 *N.J.* 421, 420 *A.*2d 333 (1980). As the court in *Milano, supra*, found, a threat does not even have to be communicated directly to the victim to be actionable; "the legal sufficiency of the evidence ... is controlled not by the identity of the hearer as such, but by considering the hearer's identity as part of the surrounding circumstances." *Ibid.* Therefore, in a domestic violence context, a court should regard any past history of abuse by a defendant as part of a plaintiff's individual circumstances and, in turn, factor that history into its reasonable person determination. *See Chenique-Puey, supra*, 145 *N.J.* at 342, 678 *A.*2d 694 ("At defendant's trial for terroristic threats to kill, his prior acts of domestic violence would be admissible for the limited purpose of demonstrating that [the victim] had reason to believe that he would make good on his threats to kill her ...."); *see also State v. Gartland*, 149 *N.J.* 456, 472–73, 694 *A.*2d 564 (1997) (finding, in case of spousal murder, that evidence of domestic abuse was relevant to

determine reasonableness of defendant's self-defense claim that deadly force was necessary to protect herself against death or serious bodily harm); *State v. Kelly*, 97 *N.J.* 178, 200–01, 478 *A.*2d 364 (1984) (same).

 A complaint charging harassment in the domestic violence context also requires an evaluation of the plaintiff's circumstances. *See Hoffman, supra*, 149 *N.J.* at 584–85, 695 *A.*2d 236. The Criminal Code defines harassment as a petty disorderly persons offense if a person, with purpose to harass another, "[m]akes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm." *N.J.S.A.* 2C:33–4(a). "[A]nnoyance" under that subsection means to "disturb, irritate or bother." *Hoffman, supra*, 149 *N.J.* at 580, 695 *A.*2d 236. Finally, the provision in *N.J.S.A.* 2C:33–4(a) prohibiting conduct communicated in any manner likely to cause annoyance or alarm encompasses, for constitutional reasons, only those modes of communicative harassment that "are also invasive of the recipient's privacy." *Id.* at 583, 695 *A.*2d 236.

In *Hoffman, supra*, this Court concluded that courts must consider the totality of the circumstances to determine whether the harassment statute has been violated. *Id.* at 584–85, 695 *A.*2d 236. In that case, the defendant twice mailed to his wife a torn-up copy of his support order while serving time in jail for prior domestic offenses. *Id.* at 573, 695 *A.*2d 236. Although finding on constitutional grounds that defendant could not be criminally convicted for harassment, the Court declared:

> The fears of a domestic violence victim and the turmoil she or he has experienced should not be trivialized. In different contexts, a recipient of a torn-up court order may not be alarmed or seriously annoyed, but some victims of domestic violence may rightly view a course of communicative conduct as seriously annoying, alarming, or threatening, or all of those things.
>
> [*Id.* at 586, 695 *A.*2d 236.]

According to the Court, conduct that does not constitute an invasion of privacy to the ordinary victim under subsection (a) might constitute harassment to the victim of past domestic abuse.

*Id.* at 585, 695 *A.*2d 236. Therefore, the Court maintained, "[i]n determining whether a defendant's conduct is likely to cause the required annoyance or alarm to the victim, that defendant's past conduct toward the victim and the relationship's history must be taken into account." *Ibid.*

The requirement that a court consider the past history of the parties, in the context of an allegation of terroristic threats, harassment, or other domestic violence, comports with the legislative intent of the statute. A central principle of statutory construction dictates that statutes are to be read "sensibly rather than literally, with the reason and purpose for the legislation controlling." *Reisman v. Great Am. Rec., Inc.,* 266 *N.J.Super.* 87, 96, 628 *A.*2d 801 (App.Div.), *certif. denied,* 134 *N.J.* 560, 636 *A.*2d 519 (1993). Statutes should not be construed so as to lead to unreasonable or anomalous results. *Ibid.* (citation omitted). In accordance with those principles, the interpretation above "reflects the reality that domestic violence is ordinarily more than an isolated aberrant act and incorporates the legislative intent to provide a vehicle to protect victims whose safety is threatened." *Peranio, supra,* 280 *N.J.Super.* at 54, 654 *A.*2d 495; *Corrente, supra,* 281 *N.J.Super.* at 248, 657 *A.*2d 440.

█ Because a particular history can greatly affect the context of a domestic violence dispute, trial courts must weigh the entire relationship between the parties and must specifically set forth their findings of fact in that regard. Furthermore, in making their determinations, trial courts can consider evidence of a defendant's prior abusive acts regardless of whether those acts have been the subject of a domestic violence adjudication. *Roe v. Roe,* 253 *N.J.Super.* 418, 431–32, 601 *A.*2d 1201 (App.Div.1992); *D.C. v. F.R., supra,* 286 *N.J.Super.* at 608, 670 *A.*2d 51.

## II.

### A.

With that background of the DVA, we now turn to an examination of the facts in this case. On the evening of July 9, 1996,

Kathleen and Richard Cesare engaged in an argument that led to the filing of a domestic violence complaint and the issuance of a temporary restraining order against defendant, Richard Cesare. At the time of the initial hearing for that restraining order, plaintiff and defendant had been married for thirteen years and had three children, ages twelve, ten, and six. Most other information about the events of July 9 and the history of the Cesares' marriage is substantially in dispute.

Plaintiff testified that, on July 9, 1996, she and defendant began arguing about her desire to end the marriage. According to plaintiff, the parties had separated for a six-week period in 1995 and, even though they had reconciled and plaintiff had moved back into the house, the marriage had been in question since that time. The couple also argued that night about the future of their children. Plaintiff testified that defendant threatened that she would never get custody of their children and that there was no way he would sell the house and split the proceeds. Plaintiff responded that, if she utilized the court system, he might not have a choice in the matter. Plaintiff stated: "I said to him that if we went through the system that, you know, I asked him, Do you think you'll have a choice?" According to plaintiff, defendant responded, "As I've told you before, I do have a choice, and you will not get either of those things."

Plaintiff interpreted that language as a threat on her life because, "[i]n the past, he has told me that he will kill me before I get custody of our children and before he gives me any part of our assets." Furthermore, plaintiff maintained, defendant purposely veiled his threat because plaintiff had recently gone to a lawyer and made his previous threats public.

Plaintiff outlined the content of some of those previous threats. Specifically, plaintiff testified:

> We have railroad tracks behind our house. He has told me he could, you know, make it look like I was taking a walk and somehow secure me to the railroad tracks until the train came. He has told me that he would put me in our shed, make it look like—tie me in our shed, make it look like some type of gas, propane explosion. He has said that he can make it look like suicide.

Plaintiff also stated that Mr. Cesare threatened to "get someone else to do it very cheaply," *i.e.*, a contract killing. Plaintiff continued:

> Over the course of the last maybe five years when our marriage would get very difficult and I would, you know, start to bring up the idea that maybe we would be better apart, it would end up in these threats, but probably only maybe, you know, it probably came to that point maybe once a year over the last five years.

According to plaintiff, defendant never retracted any of those threats and his demeanor during those encounters was both angry and intimidating.

During the confrontation on July 9, 1996, after approximately one hour and fifteen minutes of arguing, defendant stated that he felt sick and went upstairs to bed. After about five minutes, however, while plaintiff sat on the couch pretending to read the newspaper, defendant started asking plaintiff to come upstairs. In an angry and agitated voice, and without regard to the fact that two of his children were sleeping down the hall, defendant stood at the top of the stairs and shouted: "What are you still doing down there? Why don't you come up here?" After another five minutes, plaintiff testified, defendant did the same thing again. This time he came down the stairs and stood in the doorway, insisting "Are you going to stay up—are you going to stay here all night? Why don't you come upstairs?" Plaintiff stated that defendant's behavior appeared unusual to her because "[a]ny other time we've argued we've chosen to be apart for a while."

According to plaintiff, defendant glared at her angrily for a couple of minutes, with "fire in his eyes," until plaintiff responded "Why? Do you want to shoot me now?" At that point, defendant continued to glare at her for five to ten seconds and then turned and stomped up the stairs. Plaintiff feared that her husband had "gotten a gun out upstairs and that he wanted me upstairs so he could use it." Plaintiff testified that defendant kept three guns in the house, a rifle, a .357 magnum, and some other type of automatic pistol, and that the guns were either loaded or stored right next to the ammunition. Plaintiff also testified that her husband was on medication for depression.

Fearing for her safety, plaintiff put a jacket on over her pajamas and left the house and her children to go to the police department. Plaintiff stated that defendant would have heard a telephone call and that if she had tried to reach the children, whom she believed were in no immediate danger, she first would have had to pass defendant, whom she believed would have killed her. Although defendant on this occasion did not touch plaintiff, did not point a gun at her, did not use profanity, and did not explicitly state that he was going to kill her, plaintiff filed a complaint against him under the Domestic Violence Act, *N.J.S.A.* 2C:25–17 to –33.

Regarding the past history of her marital relationship, plaintiff testified to a number of instances of past abuse. Plaintiff declared:

> He, early in our marriage, he slapped me a couple of times, but it didn't turn into regular behavior. He, he would, when he was yelling at me would get me maybe against a wall, not, not even with his hands, but just with his entire body, you know, keep talking at me until I was backed up against the wall, or backed up. At one point I was completely over, bent backwards over a chair.

According to plaintiff, that incident occurred about two years before the present incident, when she threatened to call the police to stop defendant from hitting their son with some kind of object, possibly a broom. At another time, plaintiff claimed, defendant banged his four year old son's head into a shelf because an item was not where he had said it would be, and on another occasion, defendant banged his other son's head into the door jamb because he had hit the door with a ball. Plaintiff testified that, while those incidents were not commonplace, "they have happened." Finally, plaintiff testified that defendant often used profanity when referring to her and the children.

Although plaintiff testified about various disagreements and arguments, she reported only one such incident to the police, in May 1996. Plaintiff chose not to pursue the matter or seek a restraining order at that time. Finally, plaintiff acknowledged that she and her husband had been attending marriage counseling prior to the current incident.

Henry Phillips, plaintiff's father, also testified for the plaintiff. Mr. Phillips testified that defendant had confided in him that he had threatened his wife, although defendant stated that when he made such threats he did not mean them or intend to carry them out.

Defendant's version of the story differs. Defendant admitted to having an argument with his wife on July 9, 1996, regarding the future of their marriage. However, in response to his wife's statement that she was going to get custody of the house and children, defendant stated, "I don't think so, I'll fight you all the way, I have just as many rights as you do." Defendant confirmed that he used the word "choice," but insisted that this was used in response to his wife's contention that she would get full custody. Mr. Cesare testified that he said to her, "Oh, I don't think so. I have a choice in this matter, too." Defendant testified that the argument on July 9 generally concerned the couple's marriage— "my driving, sex, pulling the covers off, off her at nighttime on purpose, not letting her use the bathroom when I'm in it." After the argument ceased and defendant went upstairs to bed, defendant asserted that he walked down the stairs twice to inquire about when his wife was coming to sleep. In direct contrast to his wife's testimony, defendant stated that "it's not usual for her to stay downstairs that late," and it was normal for him to come downstairs and inquire about his wife after a fight "[t]o see if she was still upset."

Defendant denied ever making any threats on his wife's life or admitting any such threats to his father-in-law. Defendant also maintained that he used no profanity the night of the argument and that he took care of the children every morning by giving them breakfast, getting them ready for school, and waiting with them for the school bus. Finally, defendant declared that his wife "lays in bed waiting for the trigger, she dreams this stuff."

### B.

By complaint dated July 9, 1996, plaintiff obtained a temporary restraining order dated July 10, 1996, which removed defendant

from the marital home. A hearing on the restraining order was held in the Family Part of the Chancery Division of the Superior Court, and a final restraining order was entered. The trial court found that, under the totality of the circumstances, sufficient cause existed to issue the restraining order.

The trial court noted that the words used by defendant that night did not, by plaintiff's own admission, contain an explicit threat to kill. The court also pointed out that "some people will come to court with the intent of gaining an advantage in a divorce action," and that fact is something that "one has to keep in mind." However, considering the prior history and course of conduct of the parties and the relative credibility of the witnesses, the court believed that defendant's actions constituted either terroristic threats, *N.J.S.A.* 2C:12–3, and/or harassment, *N.J.S.A.* 2C:33–4, both of which are prohibited under the Domestic Violence Act, *N.J.S.A.* 2C:25–19(a).

The court concluded as follows:

> And I find that there was [a threat]. Although the words "choice" were used in this case, "I do have a choice," many implications can be found in that choice of words, because in this case on many past occasions that choice has been connected with threats to kill. I don't find that this is merely an argument and a fight for somebody's rights to retain custody of the children. Obviously everybody's entitled to fight for the custody of their children and argue to the Court as to what the appropriate disposition would be.

> But in the totality of the circumstances in this case, and taking into consideration that after this voiceful (sic) argument went on for an hour or more, and the defendant indicates that he is going upstairs, that he's had enough, he's, I gathered, too emotionally upset from this argument to continue it, and he'd rather continue it with the counselor, one has to wonder why is it that he kept coming downstairs to demand that she come up to bed?

Finally, the court stated that the testimony of plaintiff's father tipped the scale in plaintiff's favor. According to the court, "in-laws are sometimes people you turn to and confide in that you're having a problem with your spouse, and that makes sense to the Court." Furthermore, the court added, "Mr. Phillips is [not] out to gain any particular advantage on the matrimonial action person-ally for himself .... [and] I'm certain that he wouldn't willfully get up here and lie about it just to gain an advantage for his daughter."

The Appellate Division reversed. The panel held that, under a standard of review based on sufficient, credible evidence, the trial court's findings constituted a "manifest denial of justice." 302 *N.J.Super.* at 64, 694 *A.*2d 603 (citations omitted). After reviewing the facts, the Appellate Division concluded that defendant's conduct on July 9, 1996, was insufficient to qualify as a terroristic threat, as defined by *N.J.S.A.* 2C:12–3(b). The Appellate Division found that there was no evidence in the record that defendant's statements were intended to put his wife in imminent fear of her life. Furthermore, the court noted, the trial court erred in using a subjective, rather than a reasonable person, test to determine whether defendant's comments about his "choices" constituted a terroristic threat: "[w]hether plaintiff said she feared for her life as a result of defendant saying he had choices is not determinative." *Id.* at 65–66, 694 *A.*2d 603. According to the Appellate Division, an ordinary person would not perceive defendant's statements as a threat of violence. Defendant's comments in the marital argument were "reasonable, expected responses given the context of the verbal exchange," and almost anything defendant might have said in their place could have contributed to the same result. *Id.* at 66, 694 *A.*2d 603. To rule for plaintiff in this case, the court noted, would "allow a party to hold past conduct over the head of the other party like the sword of Damocles." *Ibid.*

The Appellate Division also observed that a discordant and dysfunctional relationship is an insufficient basis on which to support a finding of domestic violence. The court noted: "We are mindful that the dissolution of a marriage is often acrimonious. But such acrimony should not be used as a weapon to gain a strategic advantage in the matrimonial court, thus, trivializing and distorting the beneficial purpose of the Act to protect against regular abusive behavior." *Id.* at 67–68, 694 *A.*2d 603.

### III.

#### A.

The scope of appellate review of a trial court's fact-finding function is limited. The general rule is that findings by the trial

court are binding on appeal when supported by adequate, substantial, credible evidence. *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974). Deference is especially appropriate "when the evidence is largely testimonial and involves questions of credibility." *In re Return of Weapons to J.W.D.*, 149 *N.J.* 108, 117, 693 *A.*2d 92 (1997). Because a trial court " 'hears the case, sees and observes the witnesses, [and] hears them testify,' it has a better perspective than a reviewing court in evaluating the veracity of witnesses." *Pascale v. Pascale*, 113 *N.J.* 20, 33, 549 *A.*2d 782 (1988) (quoting *Gallo v. Gallo*, 66 *N.J.Super.* 1, 5, 168 *A.*2d 228 (App.Div.1961)) (alterations in original). Therefore, an appellate court should not disturb the "factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." *Rova Farms, supra*, 65 *N.J.* at 484, 323 *A.*2d 495. The appellate court should "exercise its original fact finding jurisdiction sparingly and in none but a clear case where there is no doubt about the matter." *Ibid.*

Furthermore, matrimonial courts possess special expertise in the field of domestic relations. *See Brennan, supra*, 145 *N.J.* at 300–01, 678 *A.*2d 667. For example, the jurisdiction of the Family Part of the Superior Court, where this case was heard, extends to "[a]ll civil actions in which the principal claim is unique to and arises out of a family or family-type relationship." *R.* 5:1–2. Such cases include alimony or child support actions, divorce or nullity actions, custody suits, actions to appoint a guardian ad litem, actions for adoption or termination of parental rights, and domestic violence complaints. *R.* 5:6 to 5:14. Moreover, the DVA specifically directs plaintiffs to file their domestic violence complaints with the Family Part of the Superior Court, permits Family Part judges to order emergency *ex parte* relief, and mandates that the Family Part hold a hearing within ten days of the filing of such a complaint. *N.J.S.A.* 2C:25–28 to –29.

■ Because of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding. As noted previously by this Court, the Legislature "has reposed grave responsibilities on Family Part judges to ensure the safety and well-being of women and children in our society.... We are confident that they can successfully balance the interests of society in deterring the evils of domestic violence and caring for families." *Brennan, supra,* 145 *N.J.* at 304–05, 678 *A.*2d 667.

### B.

■ Considering the provisions of the Domestic Violence Act and its broad legislative intent, as well as the previous history between the parties, we find that there was sufficient, credible evidence for the trial court to have found that defendant committed an act of domestic violence against plaintiff. *See Rova Farms, supra,* 65 *N.J.* at 484, 323 *A.*2d 495. Although the trial court might have specified more clearly whether defendant's actions constituted terroristic threats or harassment, or both, there was sufficient evidence to support either charge. Therefore, despite the existence of some evidence that might have supported different factual findings, given the deferential standard of appellate review discussed previously, the Appellate Division should have sustained the trial court's conclusion. Rather than second-guessing the lower court, the Appellate Division should have yielded to its discretional determination.

First, sufficient evidence existed for the trial court to have found that defendant committed terroristic threats. *See N.J.S.A.* 2C:12–3(b). Based on plaintiff's testimony that defendant had previously used the word "choice" in the context of a threat to kill, the trial court properly could find that defendant intended his words on July 9 to be another such threat. Defendant's later insistence that plaintiff come up to the bedroom, where the guns were kept, in addition to her testimony about defendant's previous threats, intimidation, and abuse of their children, could lead the

court to conclude that a reasonable victim in plaintiff's situation would have felt fear. Although defendant's words did not contain an explicit threat to kill, the surrounding circumstances were such that the trial court, in the best position to judge the credibility of the witnesses, appropriately found that "plaintiff was right in her idea of leaving her house immediately, feeling that she was threatened." *See also Butterfoss, supra,* 234 *N.J.Super.* at 611–12, 561 *A.*2d 312 (finding sufficient evidence to sustain indictment for terroristic threats where husband told wife he was going to take daughter away, wife noticed paper bag containing rope and cloth on floor of car in which they were driving, and husband simultaneously told wife of prior intention to assault her, tie her, and gag her); *Milano, supra,* 167 *N.J.Super.* at 323, 400 *A.*2d 854 (finding call to victim's girlfriend and call received by victim's brothers at victim's house, both referring to death of victim, sufficient to constitute terroristic threats).

Credible evidence also existed on which the court could have based a finding of harassment. *See N.J.S.A.* 2C:33–4(a). In the context of the parties' relationship, defendant's use of the phrase "I do have a choice" and his repeated attempts to convince plaintiff to come upstairs, which plaintiff testified were unusual after an argument, could be viewed as communications likely to cause annoyance or alarm made with the purpose to harass. Although the trial court did not use the literal language of the harassment statute in its discussion of defendant's behavior, the court appropriately analyzed defendant's communications to plaintiff on the night in question and, following the requirements of *Hoffman, supra,* 149 *N.J.* at 585, 695 *A.*2d 236, the context in which those communications took place. The trial court reviewed defendant's history of threats and violence, including his statements about tying his wife to the railroad tracks or blowing her up in the shed, as well as the fact that there were guns in the house, and found that "there was some other motive in this case." That motive, presumably an intent to harass, could certainly be found to "disturb, irritate, or bother" a woman in plaintiff's situation. *See id.* at 580, 695 *A.*2d 236. The court here understandably stated, "I

find that in fact the plaintiff is credible that these threats were made to her and that she was in fear of her life." *See also Roe, supra,* 253 *N.J.Super.* at 429–31, 601 *A.*2d 1201 (upholding trial court's finding of harassment where trial court, considering past history of violence, believed plaintiff testified credibly about current threat to kill).

This case is distinguishable from the factual situations in *Corrente, supra,* 281 *N.J.Super.* 243, 657 *A.*2d 440, *Peranio, supra,* 280 *N.J.Super.* 47, 654 *A.*2d 495, and *Murray v. Murray,* 267 *N.J.Super.* 406, 631 *A.*2d 984 (App.Div.1993). In those cases, the Appellate Division found that the defendants' actions did not qualify as harassment. *Corrente, supra,* 281 *N.J.Super.* at 244–46, 249–50, 657 *A.*2d 440 (calling wife at work to demand money to pay bills and subsequently disconnecting plaintiff's phone, because, in defendant's words, he could no longer afford it, did not constitute domestic violence); *Peranio, supra,* 280 *N.J.Super.* at 49–52, 56, 654 *A.*2d 495 (believing that plaintiff sold his possessions without permission, defendant's statement that he'll "bury her" was not actionable); *Murray, supra,* 267 *N.J.Super.* at 410, 631 *A.*2d 984 (telling wife on various occasions "that he planned to divorce her and leave her, and that he no longer loved or felt attracted by her" was not prohibited by Domestic Violence Act).

The courts in those cases agreed that what occurred between the parties was merely a matrimonial argument concerning money and property in anticipation of divorce. *Corrente, supra,* 281 *N.J.Super.* at 250, 657 *A.*2d 440; *Peranio, supra,* 280 *N.J.Super.* at 56, 654 *A.*2d 495; *see Murray, supra,* 267 *N.J.Super.* 406, 631 *A.*2d 984. The courts therefore expressed concern about the serious policy implications of permitting domestic violence allegations to be "used by either spouse to secure rulings on critical issues such as support, exclusion from marital residence and property disposition, particularly when aware that a matrimonial action is pending or about to begin." *Murray,* 267 *N.J.Super.* at 410–11, 631 *A.*2d 984 ("[P]re-divorce statements respecting absence of affection or physical desire alone were not intended to be sufficient to fulfill the elements ... necessary to constitute harass-

ment. . . ."); *Corrente, supra,* 281 *N.J.Super.* at 250, 657 *A.*2d 440; *Peranio,* 280 *N.J.Super.* at 56, 654 *A.*2d 495. In finding the contested actions to be nothing more than marital disputes, however, the courts in those cases observed that there was no history of threats, abuse, or domestic violence between the parties. *Corrente, supra,* 281 *N.J.Super.* at 250, 657 *A.*2d 440; *Peranio, supra,* 280 *N.J.Super.* at 56, 654 *A.*2d 495; *Murray, supra,* 267 *N.J.Super.* at 408, 631 *A.*2d 984.

In *Hoffman, supra,* "[w]e recognize[d] that in the area of domestic violence, as in some other areas in our law, some people may attempt to use the process as a sword rather than as a shield. The judicial system must once again rely on the trial courts as the gatekeeper." 149 *N.J.* at 586, 695 *A.*2d 236. Therefore, courts must be wary of letting a complainant use the Domestic Violence Act merely to gain an advantage in a matrimonial proceeding. However, each case depends on its facts and must be examined carefully. Here, plaintiff's testimony revealed a background of improper conduct. Moreover, the court appropriately observed and gave careful consideration to the fact that the parties were headed towards divorce.

Although the Appellate Division recognized most of the standards cited above, it failed to exercise the appropriate level of review. Because the entire case was premised on disputed testimony and the credibility of witnesses, and given the special expertise of the family court, the Appellate Division should have granted more deference to the trial court's findings.

Considering the requirements of the Domestic Violence Act, its broad legislative history and purposes, and the previous history of violence between the parties, the trial court's decision was based on sufficient, credible evidence.

The judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, STEIN, GARIBALDI and COLEMAN—7.

*Opposed*—None.