# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5443-17T3

M.N.,

     Plaintiff-Respondent,

v.

H.N.,

     Defendant-Appellant.

_____

        Argued November 20, 2019 – Decided December 6, 2019

        Before Judges Haas and Enright.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FV-13-1282-18.

        Ira W. Heller argued the cause for appellant.

        Cadence Samantha Hulme argued the cause for respondent (South Jersey Legal Services, Inc., attorneys; Cadence Samantha Hulme, on the brief).

PER CURIAM

Appellant H.N.[1] appeals from a June 14, 2018 final restraining order (FRO) entered in favor of respondent M.N. pursuant to the Prevention of Domestic Violence Act of 1991 (PDVA), N.J.S.A. 2C:25-17 to -35. We affirm, substantially for the reasons set forth in Judge Henry P. Butehorn's June 14, 2018 oral decision.

We will not recite in detail the history between M.N. and H.N. Instead, we incorporate by reference the factual findings and legal conclusions contained in Judge Butehorn's decision. We add the following comments.

H.N. and M.N. married on November 29, 2015. One child was born of the marriage on September 3, 2016. The marriage deteriorated quickly thereafter and on June 26, 2017, H.N. filed for divorce.

On July 28, 2017, M.N. obtained a temporary restraining order (TRO). That TRO was dismissed when the parties entered into a Consent Order for civil restraints (Consent Order) on September 20, 2017. Importantly, one of the provisions of the Consent Order mandated that "[t]he parties shall not harass, threaten, annoy, stalk, disturb or assault the other, nor will they permit and/or cause any third party to harass, threaten, annoy, stalk, disturb, or assault the other on his or her behalf." The Consent Order also directed "[t]he parties

---

[1] We refer to the parties by initials to protect their privacy. R. 1:38-3(d)(12).

A-5443-17T3

hereby agree to act in good faith and will not record, videotape, or otherwise document any interactions between them without the consent of both parties."

Although the parties attempted reconciliation after the entry of the Consent Order, M.N. filed for another TRO in April 2018. The final hearing to address her request for restraints commenced on May 30, 2018 and concluded in early June 2018.

M.N. testified first and was subject to extensive cross-examination by H.N.'s counsel. M.N. described in detail a number of upsetting incidents which prompted her to file for a second restraining order. For example, M.N. alleged that on April 19, 2018, when H.N.'s firearm forfeiture hearing had been scheduled, he was angry at her and threw a clothes hanger and slipper at her. Then, on April 20, while she was getting the parties' son ready for bed, M.N. claimed H.N. tried to take the child away from her. The parties briefly argued before H.N. took their son into the attic of their home and locked the door. M.N. asked her husband to bring the child downstairs and he purportedly responded, "no, shut the hell up." M.N. heard her son crying and again asked for the child to be returned to her. Eventually, H.N. turned the child over to M.N. and she decided to leave the home with the parties' son. As M.N. retrieved a pre-packed diaper bag, H.N. told her she could not leave. M.N. claimed her husband chased

A-5443-17T3

her and attempted to grab M.N. by her the shirt but missed. M.N. stated her husband stayed inside the home long enough for her to leave with their son, although she remained afraid he would follow her.

Although H.N. acknowledged there was an incident on April 20, 2018 that left him "shaking about the behavior," he denied events unfolded as M.N. described. He claimed when the parties first interacted on April 20, 2018, M.N. asked him, "what do you want?" in "this kind of tone of voice." Thinking his wife was "up to something," he took it upon himself to surreptitiously record the parties' conversation. H.N. freely admits he violated the terms of the Consent Order by recording his wife. In fact, at trial, he produced other recordings of his wife from April 2018. While under oath, he admitted there were gaps in these recordings.

Judge Butehorn also heard testimony from the parties about another incident on April 23, 2018. M.N. testified that on that day, after she gave their son a bath, H.N. "came straight for [her]" and tried to take their son away from her before she could finish dressing him. According to her testimony, she told H.N. to "please just back off, stay away because you're just making me very uncomfortable." She claimed H.N. refused to retreat and instead screamed at her and followed M.N. as she headed toward their son's room. She pleaded,

"just give me space, back up. And he said no." M.N. complained H.N. cornered her in their son's room, then left. She closed the door behind him, but he "slammed it when he opened it" two minutes later. According to M.N., she threatened to call the police, and H.N. allegedly responded, "call the f--ing police, I don't care." After this exchange, H.N. went outside and was talking on the phone, so M.N. took this opportunity to contact a representative of an agency that helps women in domestic violence situations. H.N. then left the home.

H.N. denied following M.N. or cursing at her on April 23, 2018. He also testified he did not corner his wife in a room; instead, he claimed she "cornered herself."

During the course of the trial, M.N. disclosed her husband continuously called her degrading names, such as "bitch," "slut" and "whore." Moreover, she complained he attempted to control her financially throughout the marriage because he was the sole wage earner. Further, M.N. affirmed her husband would raise a hand to her but not hit her and on one occasion he forcibly kissed her while she tried to push him away. He then bit her lip twice, causing her lip to swell. M.N. testified that she asked H.N. why he bit her and he responded, "you asked for it."

A-5443-17T3

M.N. testified about another incident in 2017, during a reconciliation period. She claimed the parties were in H.N.'s car and he took a phone call. Once the phone conversation ended, H.N. told M.N. someone owed him $200,000. M.N. asked why H.N. did not bring this individual to court and H.N. purportedly replied, "the court system doesn't work for him and he takes matters into its own hands." H.N. then showed M.N. a gun he had stored in the car and when she asked H.N. why he had this gun, he allegedly stated, "this is what happens when someone messes with me." M.N. testified that a few days thereafter, her husband referenced the gun and said, "you know what that means."

H.N. denied any history of domestic violence and insisted he did not call his wife degrading names or withhold monies from her. Regarding the 2017 gun incident, H.N. denied threatening his wife and explained he showed M.N. his gun to introduce her to his "hobby."

In his extensive June 14, 2018 oral decision, Judge Butehorn credited M.N.'s testimony, but found H.N.'s credibility to be lacking. Specifically, the judge stated:

> I find the plaintiff to be more credible. The plaintiff provided consistent answers throughout her testimony. And even in the face of persistent and overwhelming cross-examination, she remained consistent with her

6

A-5443-17T3

testimony. . . . even . . . when minutia were explored . . . . Her demeanor and eye contact during her testimony were also indicative of veracity.

On the other hand, the judge found:

> [D]efendant's demeanor was the polar opposite. His answers were short in manner, consistent with trying not to say much to prevent . . . contradictions. . . . And then contrary to plaintiff's expressions of genuine emotion, his appeared feigned. [Defendant's recordings] were selective recordings by defendant to manipulate a certain claimed version of what took place to try and place himself in a favorable light. . . . Ultimately, the [c]ourt finds an attempt to manipulate the events of pre-planned alteration, even more reason the [c]ourt found his credibility to be lacking. . . . Defendant tried to argue plaintiff was at fault for their conflicts or suggest they were mere contretemps; . . . . There were conflicts regarding the child. However, it was defendant trying to use the child as a means to manipulate and control the plaintiff; repeated, persistent and continued behavior, a means of annoying and alarming plaintiff through constant interference with her attempts to care for the child. That conclusion . . . becomes even more clear when their history is taken into consideration.

Judge Butehorn found H.N. committed the predicate acts of harassment, as defined in N.J.S.A. 2C:33-4 and that M.N. needed an FRO to protect her from immediate danger as well as future acts of domestic violence. On appeal, H.N. maintains Judge Butehorn erred by finding H.N. harassed his wife and that the judge abused his by granting M.N. an FRO. We disagree.

7

In adjudicating a domestic violence case, the trial judge has a "two-fold" task. Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006). First, the judge must determine if the plaintiff has proven, by a preponderance of evidence, that the defendant committed one of the predicate acts referenced in N.J.S.A. 2C:25-19(a), which incorporates harassment, N.J.S.A. 2C:33-4, as conduct constituting domestic violence. Id. at 125-26. The judge must construe any such acts in light of the parties' history to better "understand the totality of the circumstances of the relationship and to fully evaluate the reasonableness of the victim's continued fear of the perpetrator." Kanaszka v. Kunen, 313 N.J. Super. 600, 607 (App. Div. 1998); N.J.S.A. 2C:25-29(a)(1). "A defendant's prior abusive acts should be considered 'regardless of whether those acts have been the subject of a domestic violence adjudication.'" Pazienza v. Camarata, 381 N.J. Super 173, 183 (App. Div. 2005) (quoting Cesare v. Cesare, 154 N.J. 394, 405 (1998)). "[N]ot only may one sufficiently egregious action constitute domestic violence under the Act, even with no history of abuse between the parties, but a court may also determine that an ambiguous incident qualifies as prohibited conduct, based on a finding of violence in the parties' past." Cesare, 154 N.J. at 402.

Secondly, if a predicate offense is proven, a court must assess "whether a restraining order is necessary, upon an evaluation of the facts set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse." J.D. v. M.D.F., 207 N.J. 458, 475-76 (2011). Whether a restraining order should issue depends on the seriousness of the predicate offense, on "the previous history of domestic violence between the plaintiff and defendant including previous threats, harassment [,] and physical abuse," and on "whether immediate danger to the person or property is present." Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995) (citing N.J.S.A. 2C:25-29(a)); Cesare, 154 N.J. at 402. Applying these standards to H.N.'s arguments on appeal, we are satisfied there was substantial credible evidence to support Judge Butehorn's finding that M.N. satisfied both prongs of Silver.

N.J.S.A. 2C:33-4 defines harassment, in relevant part, as follows: "[A] person commits a petty disorderly persons offense if, with purpose to harass another, he: (a) Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm[.]" Proof of a purpose to harass is an essential element of N.J.S.A. 2C:33-4. See L.D. v. W.D., 327 N.J. Super. 1, 5 (App. Div. 1999). "A finding of a

purpose to harass may be inferred from the evidence presented," and "[c]ommon sense and experience may inform that determination." State v. Hoffman, 149 N.J. 564, 577 (1997). Because direct proof of intent is often absent, "purpose may and often must be inferred from what is said and done and the surrounding circumstances," and "[p]rior conduct and statements may be relevant to and support an inference of purpose." State v. Castagna, 387 N.J. Super. 598, 606 (App. Div. 2006).

Here, the judge concluded that H.N. had committed the predicate act of harassment on April 23, 2018, but he also had engaged in prior controlling and abusive behavior toward M.N. This finding is amply supported by the record.

There is also credible evidence in the record to support Judge Butehorn's conclusion, under the second prong of the Silver test, that an FRO was needed to protect M.N. As the judge noted, defendant's own testimony confirmed he freely violated the parties' Consent Order and recorded the parties' interactions in April 2018. Judge Butehorn found such behavior was "consistent with a pattern of controlling and intimidating conduct" on the part of H.N.

Our review of a trial judge's fact-finding function is limited. Cesare, 154 N.J. at 411. A judge's fact-finding is "binding on appeal when supported by adequate, substantial, credible evidence." Id. at 411-12 (quoting Rova Farms

Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484 (1974)). Moreover, "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." Id. at 413. This is so because the judge has the opportunity to see and hear the witnesses as they testify, thereby developing a "'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 396 (2009) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). A judge's purely legal decisions, however, are subject to our plenary review. Crespo v. Crespo, 395 N.J. Super. 190, 194 (App. Div. 2007) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Guided by these principles, we are satisfied Judge Butehorn's factual findings and legal conclusions are unassailable.

To the extent we have not addressed H.N.'s remaining arguments, we find they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5443-17T3