# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3606-20

A.R.R.,

    Plaintiff-Respondent,

v.

H.E.C.,

    Defendant-Appellant.

_____

Argued March 30, 2022 – Decided August 29, 2022

Before Judges Accurso and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FV-07-2029-21.

Casandra T. DeStefano argued the cause for appellant (Tonacchio, Spina & Compitello, attorneys; Ciro Spina, on the briefs).

Rasmeet K. Chahil argued the cause for respondent (Lowenstein Sandler LLP, attorneys; Paul F. Giannoglou and Michael T. G. Long, on the brief).

PER CURIAM

Defendant H.E.C. appeals from a final restraining order entered against him pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35, based on the predicate acts of harassment, N.J.S.A. 2C:25-19(a)(13), and contempt of the temporary restraining order, N.J.S.A. 2C:25-19(a)(17). He contends the court's credibility and factual findings are flawed and the evidence was insufficient to establish either a predicate act or that plaintiff A.R.R. required the protection the order provides.[1]  Having reviewed the record, we cannot agree on either point and, accordingly, affirm the restraining order.

The facts were established at a hearing conducted on June 8, 2021, at which both parties testified.  Plaintiff testified she and defendant met as children through family friends but didn't start dating until early 2016 when both were in their mid-twenties.  Plaintiff was then working as a paralegal.  Defendant is a mechanical engineer, commissioning "mission critical

_____

[1]  Because we are satisfied the trial court's finding of the predicate act of harassment is well supported in the record, we do not consider whether plaintiff also proved the predicate act of contempt of a domestic violence order pursuant to subsection b. of N.J.S.A. 2C:29-9 that constitutes a crime or disorderly persons offense under N.J.S.A. 2C:25-19(a)(17).  See Tribuzio v. Order, 356 N.J. Super. 590, 598-99 (App. Div. 2003) (concluding defendant's conduct constituted the predicate act of harassment and, accordingly, declining to "address whether defendant's conduct also constituted stalking").

A-3606-20

equipment," at hospitals and data centers, "making sure their electrical grid is up to par and ready for any disturbances." The parties moved in together in mid-2018 in New York, and plaintiff ended their relationship in August 2020, when she moved out and relocated to New Jersey.

According to plaintiff, in the beginning of their relationship, defendant "was kind, respectful, very charming and funny," but he changed slowly over time. She described several incidents beginning in late 2017 of defendant shoving or slapping her when he was drunk or angry. Defendant denied ever having been physically violent with plaintiff. Plaintiff, however, had a photograph of her thigh with raised red marks reminiscent of a handprint, which the court admitted in evidence. Plaintiff testified she took the photograph about a half an hour or so after defendant slapped her a couple of months before she moved out. Plaintiff claimed her leg hurt for days, and she told defendant if he hit her again, she would call the police. According to plaintiff, "he just said he was 'playing.'"

At the hearing, defendant admitted he slapped plaintiff's leg, causing the injury in the photograph, but testified he was "just playing." According to defendant, he and plaintiff were in a "tickle-fight" that she started. He claimed plaintiff, who is nine inches shorter than he is and nearly one hundred pounds

3

lighter, "put [him] in a chokehold." When she didn't respond to him "telling her, tapping her like hey, you got it got it," he slapped her "out of the last act of desperation." He claimed "it was all playing around."

Plaintiff testified she became more dependent on defendant over the course of their relationship, which she came to believe was his design. She relied on him for transportation as she did not drive, and he discouraged her efforts to get a driver's license by sitting in the passenger seat, yelling and making her anxious when she was at the wheel. She claimed she became financially dependent on defendant when he encouraged her to quit her job and go to school full time in September 2019. Plaintiff testified defendant monitored her finances, and she believed purposely tried to exhaust her savings, buying furniture and things for defendant's new house, which he could readily have purchased himself.

According to plaintiff, defendant controlled their intimate relationship as well, waking her in the middle of the night and not allowing her to go back to sleep until she had sex with him. Defendant admitted to sometimes waking plaintiff for sex, testifying it may have happened four or five times over the course of their relationship. Asked about it on direct examination, he testified, "everyone gets a little — a little touchy feely at nighttime. Some nights she

would say no, that would be fine, I would just rollover and fall asleep."  He was adamant he never forced her to have sex, saying "I'm not that guy."

Plaintiff recounted that near the end of their relationship, defendant began "acting more hostile, picking fights with [her] a lot more."  She testified defendant became "unpredictable," and she "didn't feel safe around him" after he made several comments alluding to him killing or harming her.  Plaintiff moved out without telling defendant in late August 2020.  She left the computer they shared, signing out of all her accounts, but took the cell phone he had given and set up for her.

About two months after plaintiff left, and after she failed to respond to six different email messages defendant sent from three different accounts, she began to get notices from Instagram that someone was trying to log into her account.  In December, she received several notifications on her iPhone that she was logged onto a different device, although the only device she had was that cell phone.  When she signed into her iCloud account, she saw her "iCloud was logged onto [her] phone, and [defendant's] computer as well as another phone that he's in possession of."  Plaintiff testified she tried to reset the passwords to her account but the problems continued.

5

Over the next couple of months, when she logged into the new laptop she'd purchased, "the mouse would move on its own. [Defendant's] name was popping up in auto fill. There were a lot of updates, strange activity." When plaintiff called the computer company, she learned her laptop was being controlled remotely. She testified she believed her passwords were being changed through the use of a key logger, which she described as "some type of device . . . used to record my passwords" because she would change her passwords "and minutes later they would be changed" again and she would be locked out. Plaintiff testified her iCloud, Spotify, Facebook, Instagram, Microsoft, and Google Drive accounts were all hacked and she never regained access to any of them. With the hacking of her Google Drive account, plaintiff testified she lost access to all her personal photos and documents.

Plaintiff's Malloy College account was also hacked, which prevented her from attending classes during the months the college was operating remotely because of the COVID-19 pandemic. She missed so many classes during the first weeks of January and February 2021 that she'd been forced to drop all her courses in the Spring 2021 semester. According to plaintiff, she tried unsuccessfully to reset her password several times, working with the college's IT staff. She testified she believed defendant was behind the hacking because

6

he had access to her accounts through their shared computer, he'd set up her iPhone, and her Malloy account name was changed to "New York Rangers 1." Plaintiff testified there was a picture of her in a Rangers shirt on social media. She believed the account name was defendant's "way of letting me know that he was still monitoring me."

Plaintiff presented the testimony of the senior director of technology at Malloy College. He explained that he'd been alerted plaintiff's student email account and learning management login were both compromised and being manipulated by someone else, necessitating the creation of entirely new accounts. Although the college had not been able to identify the hacker by connecting the IP address to a particular person, he and his staff were able to connect "a general vicinity of the IP address," which was Westbury, New York. Defendant lived in the neighboring town of Hempstead. The college ended up lending plaintiff a laptop to continue her studies.

Plaintiff also testified she'd been hounded by a bill collector over payment for a couch the parties had purchased by trading it in for their old couch. While the furniture company had successfully delivered the new couch, it had somehow gotten the wrong address for picking up the old couch, although both were at defendant's home. Plaintiff believed defendant

7

"deliberately gave them the wrong address and now they're billing me for the full amount even though he's in possession of both couches." As recently as three months before the hearing — over six months after plaintiff left defendant's home and after the TRO had been entered — the furniture store advised her defendant had called to say he could not help with the issue. Although defendant denied having anything to do with the computer hacking or the problem with the furniture store, he admitted on cross-examination that he knew the store would look to plaintiff to collect the balance due on the new couch if the old one was not returned.

Plaintiff testified the entire several-month ordeal had put her under "severe emotional distress" and anxiety. She claimed she had been prescribed anti-anxiety medication and was seeing a therapist weekly as she was in "a constant state of hyper-vigilance and fear all the time. . . . Because I already saw what he did and I feel like he's not going to stop."

Having heard the testimony, the judge entered the FRO, finding plaintiff had established a history of domestic violence based on her testimony and the picture of the injury to her leg, which defendant admitted he caused, as well as a predicate act of domestic violence in the form of harassment and contempt of the TRO, but not the other predicate acts alleged — criminal mischief, cyber

A-3606-20

harassment and terroristic threats — and that she was in need of the protection of an FRO. The judge found plaintiff a credible witness, noting she testified consistently and responded in like manner to questions posed on both direct and cross examination. In contrast, the judge found defendant not credible or believable, rejecting his claim "that any acts committed by him against plaintiff either did not happen or could be explained away." She found defendant's confusing explanations over how the furniture store could readily determine his address for delivery of the new couch, but not for pick-up of the old one, led her to conclude defendant gave "the wrong address to the store," and only resolved the problem "shortly before the date of the hearing to present himself in a better light."

After reviewing the applicable law and summarizing the allegations and the testimony elicited at the hearing, the judge found plaintiff had harassed plaintiff by "improperly access[ing] her computer with the purpose to alarm and to seriously annoy [her]." Acknowledging defendant's argument that plaintiff had not adduced any direct evidence that he "hacked or improperly accessed plaintiff's computer," the judge noted "circumstantial evidence can be as compelling as direct" evidence, and was so here. The judge noted neither party testified "that plaintiff's access to her phone, her computer, and

9

corresponding social media accounts, and school accounts was problematic before she fled from defendant." The judge found it undisputed that the parties shared a computer during the time they lived together and defendant "set up her phone" and "knew her passwords." He also "knew or had reason to know her social media accounts," and "her network of family and friends."

The judge also found "defendant monitored [plaintiff's] finances, encouraged her dependency, controlled their sexual relationship, shoved her, struck her, and yelled at her." Given the parties had known each other since childhood, the judge concluded it was not an overreach "to presume that defendant was in a position to know plaintiff's vulnerabilities, and how to exploit the same."

The judge found there was "a previous history of domestic violence between the parties," and "defendant's harassment electronically from New York to New Jersey" was "a continuing act of domestic violence." She further found there existed an immediate danger to plaintiff's person or property, and credited plaintiff's testimony that she is "in fear all the time," "hyper vigilant," and "in treatment with a psychiatrist for anxiety." Given those findings, the judge determined plaintiff remained under threat and for her safety and to prevent further abuse required the protection an FRO provides.

10

Our review of a trial court's factual findings is limited.  Cesare v. Cesare, 154 N.J. 394, 411 (1998).  Findings by the trial court "are binding on appeal when supported by adequate, substantial, credible evidence."  Id. at 412.  Deference is especially appropriate in a case, such as this one, in which the evidence is largely testimonial and involves questions of credibility because the trial court's ability to see and hear the witnesses provides it a better perspective than a reviewing court to judge their veracity.  Ibid.

A final restraining order may issue only if the judge finds the parties have a relationship bringing the complained of conduct within the Act, N.J.S.A. 2C:25-19(d); the defendant committed an act designated as domestic violence, N.J.S.A. 2C:25-19(a); and the "restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse." Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006) (noting once the jurisdictional prerequisites have been met, the judge's task is two-fold; first to determine whether plaintiff proved a predicate act, and, if so, whether a final restraining order is necessary to protect the victim from immediate danger or to prevent further abuse).

A-3606-20

Applying those standards here, we find no basis to upset the factual findings or legal conclusions of the trial court set forth above. The parties were both represented by counsel and each party testified — plaintiff at length and defendant very briefly, and only to flatly deny or minimize plaintiff's many allegations. The judge had ample opportunity to judge their credibility and obviously found defendant's seriously lacking. The judge believed plaintiff that defendant monitored her finances, encouraged her dependency, controlled their sexual relationship, and physically abused her, and rejected defendant's attempts to deny or minimize "any acts committed by him" — as we do here.

The trial judge's conclusion that defendant committed the predicate act of harassment by "improperly access[ing] [plaintiff's] computer with the purpose to alarm and to seriously annoy [her]" was based on factual findings well-supported by the record. Specifically, defendant's access to the parties' shared computer and plaintiff's phone, his technical background as a mechanical engineer, commissioning "mission critical equipment" at hospitals and data centers, his knowledge of her passwords and the social media accounts she utilized, the extent and timing of the hacking and the absence of any problem with plaintiff's computer or phone before she fled defendant, all

12

support the judge's conclusion that defendant manipulated plaintiff's online accounts with the express purpose of alarming or seriously annoying her. See H.E.S. v. J.C.S., 175 N.J. 309, 326 (2003) (noting "'[a] finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience" (quoting State v. Hoffman, 149 N.J. 564, 577 (1997))).

As we noted in Silver, once a court has concluded the plaintiff established an act of domestic violence, the "second determination — whether a domestic violence restraining order should be issued — is most often perfunctory and self-evident." 387 N.J. Super. at 127. We believe the ongoing and pervasive nature of the hacking made it so here. Notwithstanding, the trial judge explained her reasons for entering the order — defendant's prior history of controlling behavior and domestic violence toward plaintiff, the timing of the hacking, that defendant was in a position to know plaintiff's vulnerabilities, and the impact of the hacking on plaintiff's physical and mental wellbeing — all of which have considerable support in the record. The judge's factual findings and credibility determinations were adequate, and her legal analysis is sound. We find no error, much less reversible error, in her conclusion that plaintiff required the protection of a final restraining order.

A-3606-20

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

14