# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0441-21

R.M.M.,

    Plaintiff-Respondent,

v.

E.S.M.,

    Defendant-Appellant.

_____

Argued October 3, 2022 – Decided October 18, 2022

Before Judges Enright and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FV-04-3532-21.

Nathan J. Mammarella argued the cause for appellant (Rosenberg Perry & Associates, LLC, attorneys; Daniel M. Rosenberg and Nathan J. Mammarella, on the brief).

Noorzahan Khan argued the cause for respondent (South Jersey Legal Services, Inc., attorneys; Noorzahan Khan, Cheryl Turk Waraas, and Kenneth Goldman, on the brief).

PER CURIAM

Defendant E.S.M.[1] appeals from a September 8, 2021 final restraining order (FRO) entered in favor of his wife, plaintiff R.M.M., pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. We affirm.

On June 22, 2021, plaintiff applied for and received a temporary restraining order (TRO) based on allegations defendant sexually assaulted her. In an amended TRO dated August 4, 2021, plaintiff was awarded primary physical custody of the parties' two sons, then nine and thirteen, subject to defendant having "substantial parenting time." The amended TRO also granted plaintiff temporary possession of the marital home. She subsequently amended her TRO complaint to include additional detail about the sexual assault, defendant's controlling behavior during the marriage, and his refusal to return the children to her custody pursuant to the August 4 order.

The trial court conducted a two-day trial via Zoom on August 18, and September 8, 2021. At the start of the hearing, defendant's attorney objected to the case "proceeding by way of Zoom." The judge asked why a live proceeding was required, considering "the present predicament we are in," an apparent

---

[1] We use initials to protect plaintiff's privacy. See R. 1:38–3(d)(9) to (10).

reference to the COVID-19 pandemic. Counsel responded, "we're not having a live hearing," adding defendant had "a right to face his accuser and . . . confront all witnesses," but was "unable to do it in this format." The judge denied counsel's request to have the matter proceed in person.

During plaintiff's direct examination, she confirmed the parties were married for fourteen years and had two children together.[2] The couple met when plaintiff was a sex worker and defendant was one of her clients.

In addressing her allegation of sexual assault, plaintiff testified that on June 2, 2021, she parked in a hotel parking lot to meet up with a friend; she had not informed defendant about her plans. Defendant drove to the hotel parking lot "within [twenty] minutes, or a half hour" after plaintiff arrived there and "pulled up next to" her. According to plaintiff, "[t]here were some words back and forth" before she pulled out of the parking lot and headed home. Defendant followed her there.

Plaintiff testified that after the parties went home, their argument became "heated" with "lots of tension." They went to their bedroom for "more privacy" because others were in the home. As the argument continued, defendant called

---

[2] Plaintiff has three other children from a prior relationship.

A-0441-21

plaintiff a "prostitute" and a "whore." She testified defendant would not let her leave the bedroom and "took [her] purse, which contained [her] keys and . . . phone and . . . license." Accordingly, plaintiff changed into "a shirt and a pair of underwear" and "got into bed," wrapping a blanket around her. She described what happened next:

> I was under the blanket and I was hoping to just maybe fall asleep . . . and before I know it, he ripped that blanket off of me violently and was standing there naked with an erection . . . and proceed[ed] to grab at me and . . . pull[] my underwear off of me physically, ripping them. I kicked at him, I remember making contact with his stomach, . . . telling him no and he proceeded to get on that bed and forced himself on me by pulling my legs apart. I had my knees tucked up and tight together and he pulled my knees apart and entered me. And he didn't stop until he was finished. [A]nd I was telling him he was hurting me[;] he told me, "good." So, I just sort of put the pillow over my face and allowed him to just finish. I figured it would be over and . . . when he was finished . . . I don't know where he went in the room, I just wrapped myself back up into the blanket and I laid there very quietly for a while.

Plaintiff testified "[t]he next day got a little worse." Defendant continued to disparage her, told her she was "a whore" and he was her "boss now and everything that [she did would] be when" he said so, including her giving him oral sex if that's what he wanted. Plaintiff stated, "he meant it because he would order me to go back up to the bedroom and wait for him because I'm 'a whore'

4

and now I'm 'his whore' and . . . this went on for four days." She added, "he basically was telling me I will not leave the house . . . unless I have my children with me or he's with me." Plaintiff also stated defendant never returned her belongings from her purse.

Further, plaintiff testified that on June 5, 2021, defendant demanded she "go back up to the bedroom and . . . make [him] forget everything."[3] Plaintiff gave defendant "oral sex," hoping "he could forgive [her]." Shortly thereafter plaintiff went downstairs to fold laundry but defendant "started up again," disparaging her. He went into the kitchen and kicked "a metal restaurant cart that h[eld] all of [their] dishes and serving things" so that "everything flew and broke off." With bowls, dishes and trays "just smashed all over the tile floor everywhere," defendant ordered plaintiff to "hurry up and clean it up." While plaintiff was picking up pieces of the broken dishware, defendant told her "[y]ou're a whore, you should just kill yourself."

In response to this comment, plaintiff took a bottle of Prozac she had been prescribed and attempted to swallow some pills from the bottle. She stated,

---

[3] Because the trial transcript refers to this incident occurring either on June 5 or June 6, 2021, we refer to it as having happened on June 5 and are satisfied the discrepancy does not affect our analysis.

"they wouldn't go down because they're capsules." As plaintiff tried to take the pills, defendant "chased [her] around" and called 9-1-1.

First responders arrived on the scene; plaintiff recalled telling one police officer, "I just need to get out of this house and I need to get away from my husband." She told other first responders she was "'not safe here at this moment.'" EMTs asked her if she wanted to go to the hospital and "get checked out" as she "was having trouble breathing" and "very upset." Plaintiff agreed to be transported to a local hospital and was admitted for four days before voluntarily going to an inpatient program for nine days.

Plaintiff testified that when she was released from the program, she was not prescribed any additional medication nor was she deemed "a danger to herself or others." Also, she stated she willingly submitted to a drug test at the request of the Division of Child Protection and Permanency and the test was negative. Additionally, plaintiff testified that on June 22, 2021, she went to the police to report her husband sexually assaulted her earlier that month.

When asked to describe the parties' sexual relationship, plaintiff answered, "sometimes it was very strained, . . . very demanding. It wasn't healthy . . . most times. It was when he needed it and wanted it and when it wasn't that way, our marriage . . . suffered."

6

Plaintiff also stated defendant controlled the family's finances during the marriage and she was not allowed to work outside the home without his permission. Further, she testified defendant constantly monitored her, explaining there were "video cameras in the home" that had zoom-in capability and defendant "watche[d] everything that [went] on in the house, and screenshot[] it, and sen[t] . . . a picture of what you [were] doing wrong. It happen[ed] all the time."[4] Plaintiff also stated defendant tracked her phone and would show her "locations where [she] was, how long [she] stayed there," and would question "everything [she'd] done."

Regarding the parties' existing parenting time arrangements, plaintiff testified that after her TRO was amended to award her primary physical custody of the children and temporary possession of the marital home, she returned home but the children were not there. Moreover, she found the home "in disarray" with "trash bags all over the place, things . . . taken off the wall" and her sons' bedrooms "emptied out" with "nothing in the [dresser] drawers" and "all their computers . . . gone." She also noted that during an arranged visit with her sons,

---

[4] Notably, when defendant's father subsequently testified for defendant, he denied defendant "exhibited any signs of controlling behavior," but stated he believed there were "cameras throughout the [parties'] house."

A-0441-21

the parties exchanged the children at a local diner but defendant "stayed parked in the parking lot" "the whole time."

Based on plaintiff's testimony, the judge invited counsel to discuss "what needs to be accomplished to resolve the violation of the court's order granting plaintiff custody." Although defendant's attorney denied defendant violated the custody provisions of the amended TRO, the judge disagreed and stated, "the children need to be returned to [the marital] home, the property needs to be returned to this home," and the children's clothing must "be returned to that house not by [defendant], but by a third-party within 24 hours." The judge cautioned defendant was "within a breath of this court finding him in contempt."

During cross-examination, defendant's attorney asked plaintiff if she told the police on June 22 that she "attempt[ed] to hurt [her]self" earlier that month, when first responders were called to her home. She answered, "I do not believe I tried to kill myself. It was not my intention to kill myself." Plaintiff explained she "did not take an overdose of pills. . . . [I]t never . . . got to that point," and before first responders came to her home, her "intention was for [defendant] to stop and leave [her] alone" because she "was at a breaking point."

On the second day of trial, defense counsel played a video recording of plaintiff's interaction with first responders on June 5 before asking her if she

8 <span>A-0441-21</span>

told paramedics that day that she "didn't want to live." Plaintiff stated, "I told them I didn't want to be there. I needed to get out of that house. I needed to leave." Defendant's attorney pressed on, stating, "Ma'am, . . . . [in t]he video we just watched, you indicated to the paramedic that you didn't want to live." The judge interjected, "[c]ounsel, you make that representation. I listened to the video. I did not see that, [n]or did I hear that . . . . I don't know how you could cross-examine with something the court could not interpret as the statement . . . you are making to the witness." Defendant's attorney maintained his representation about the recording was correct and asked to play it again for the court; the judge granted the request but advised counsel he had his "volume all the way up" to listen to the recording.

After replaying the segment of the recording at issue, defendant's attorney asked the judge if he heard plaintiff telling a paramedic she "didn't want to live." The judge repeated he could not hear this statement − although he could "hear people talking" on the recording. Additionally, the judge stated counsel "hear[d] something different than the witness." Further the judge noted he was able to hear plaintiff tell the paramedic, "I need to get out of here," before pointing out, "[t]hat's what the witness is testifying to." Defense counsel responded this was "a Zoom issue" because the video recording was not "faint." The judge

reiterated his "speakers [were] at 100 percent" volume and commented that the witness "testified [the recording] doesn't say what [defense counsel] report[ed] it to say."[5]

---

[5]  Although we were not provided with a copy of the video recording, the transcript from this portion of the September 8 hearing reflects that when the video was first played for the court, it was transcribed as follows:

> THE PARAMEDIC: Yeah.  What happened?
>
> []PLAINTIFF: Just something happened in there and he -- he just busted up the whole kitchen.  And it's just -- it's a marriage thing, and I need to be out of this situation.
>
> THE PARAMEDIC: Okay.
>
> []PLAINTIFF: I just want to leave now.  I need some help, and I need to get out.
>
> THE PARAMEDIC: When you say you don't want to live, what do you mean?  Do you feel like you want to harm yourself?
>
> []PLAINTIFF: (inaudible)
>
> THE PARAMEDIC: All right.
> [(Emphasis supplied.)]

When the recording was played a second time, the transcriber again captured plaintiff as saying to the paramedic, "I just want to leave now."

After plaintiff's testimony concluded, her attorney called defendant to testify. Defendant declined to take the stand and invoked the Fifth Amendment, although no criminal charges were pending.

Next, plaintiff called her adult daughter as a witness. Plaintiff's daughter corroborated defendant would not let plaintiff work. She also testified that on one occasion when she went out to breakfast with her mother, defendant "must have called [plaintiff] about [thirty] times." Plaintiff's daughter recalled defendant proceeded to call her directly and told her, "[y]ou need to tell your mother to answer her phone. She's my wife. . . I need her available at all times." Further, plaintiff's daughter attested that after plaintiff was hospitalized in June 2021, defendant informed her plaintiff "was a prostitute," "a swinger," and "[s]he left . . . the house . . . a mess."

Defendant called Officer Jason Hina to testify. The officer stated when he met with plaintiff on June 22, 2021, she reported she was sexually assaulted by defendant. Defense counsel asked if plaintiff told the officer what her intention was when she consumed pills at her home on June 5. The officer testified plaintiff "led [him] to believe that the attempt was to commit suicide," but he immediately clarified this statement by adding, "I do not recall if she specifically mentioned that intent."

When the trial ended, the judge granted plaintiff an FRO.[6]  He remarked that by using "the old tools of determining credibility," listening to plaintiff's testimony and "looking at her on the Zoom presentation," where he could "expand the visual view by making her Zoom picture fill the whole video monitor up," he found plaintiff was "a reasonably credible person."  The judge observed, "[t]here is nothing . . . that is so unusual about her testimony that she shouldn't be believed."  Further, he determined by a "preponderance of evidence" not only that plaintiff "believed that she was sexually assaulted," but this act "occurred."  Moreover, the judge found because the "sexual assault [was] an egregious act . . . in itself," it was "adequate for a final restraining order" and he was not bound to "use the necessary Silver [v.] Silver[7] criteria."

On appeal, defendant contends his "due process rights were infringed by the use of Zoom technology."  Moreover, he argues the judge's "credibility determinations were tainted by the inability of [his attorney] to conduct a meaningful cross-examination"; and the judge failed to address whether there was a need for continuing restraints by neglecting to "conduct a full analysis of

---

[6]  The FRO was amended on September 10, 2021 to include a provision that defendant was barred from contacting or communicating with plaintiff.

[7]  Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006).

the factors listed [under] N.J.S.A. 2C:25-29(a)." Defendant urges us to vacate the FRO and remand the matter "for an in-person hearing . . . to rectify the due process violations that occurred over the Zoom video format." Because we are satisfied defendant was afforded due process during the FRO hearing and that plaintiff met her burden under Silver, we affirm.

Findings by a trial court are generally binding on appeal, provided they are "supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)); see also Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016). We defer to the trial court's findings unless those findings appear "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms, 65 N.J. at 484).

An appellate court owes a trial court's findings deference especially "when the evidence is largely testimonial and involves questions of credibility." Ibid. (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). Further, we "accord particular deference to the Family Part because of its 'special jurisdiction and expertise' in family matters." Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare, 154 N.J. at 412). However, "all

legal issues are reviewed de novo." Ricci v. Ricci, 448 N.J. Super. 546, 565 (App. Div. 2017) (citing Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)).

In deciding whether to grant a final restraining order, a trial court must engage in a two-step inquiry. Silver, 387 N.J. Super. at 125. The court must first determine whether the plaintiff proved, "by a preponderance of the credible evidence," that a defendant committed one of the predicate acts listed in the PDVA. Ibid. Second, if a trial court finds the defendant committed a predicate act, it must decide whether to issue a restraining order. Id. at 127. The court should issue a restraining order if it is necessary to protect a victim from further abuse. Ibid.

Sexual assault is one of the predicate acts listed in the PDVA. See N.J.S.A. 2C:25-19(a)(7). Pursuant to N.J.S.A. 2C:14-2(c)(1), a person is "guilty of sexual assault if the actor commits an act of sexual penetration with another person" "using coercion or without the victim's affirmative and freely-given permission." Here, considering plaintiff's unrebutted testimony, which the judge credited, we are persuaded there was overwhelming evidence to support the judge's finding defendant sexually assaulted plaintiff. Although defendant contends plaintiff "did not prove a predicate act of [s]exual [a]ssault by a

14

preponderance of the evidence," this argument is wholly lacking in merit.  R. 2:11-3(e)(1)(E).

Regarding defendant's contention the Zoom format of the trial deprived him of his right to meaningfully cross-examine plaintiff about her sexual assault allegations, we are not persuaded.  "Fundamentally, due process requires [notice and] an opportunity to be heard at a meaningful time and in a meaningful manner."  Doe v. Poritz, 142 N.J. 1, 106 (1995).  "Due process is not a fixed concept, however, but a flexible one that depends on the particular circumstances."  Ibid.  Pertinent to this appeal, our Supreme Court recently explained that "virtual [proceedings] are a temporary measure invoked to meet an extraordinary, life-threatening public health crisis," and while "the use of technology, like all human undertakings, will not meet the test of perfection[,]. . . . virtual . . . proceedings comply with the essential tenets of the fundamental fairness doctrine."  State v. Vega-Larregui, 246 N.J. 94, 131, 136 (2021).

Although defendant cites D.M.R. v. M.K.G., 467 N.J. Super. 308, 313 (App. Div. 2021) to support his due process argument, his reliance is misplaced. In D.M.R., the trial court conducted a remote FRO trial over Zoom that consisted of several "irregularities," including "the trial court's questioning of plaintiff's

mother at times," which "approached advocacy," and the court's failure "to meet the requisite standard of impartiality." Id. at 321-22. Because of these errors, we concluded the defendant was deprived of her due process rights. Id. at 322. Here, the proceeding did not suffer from the same infirmities as those in D.M.R. Unlike in D.M.R., the parties were both represented by counsel. Moreover, our review of the record reflects the judge maintained the requisite formality for the FRO hearing and was impartial throughout the trial.

We also are not convinced the judge's credibility determinations were "tainted" by virtue of the Zoom format of the trial, despite that the judge and defendant's attorney disagreed on what plaintiff told a paramedic on the June 5 video recording. Indeed, the record demonstrates the judge carefully listened to the recording twice and he, as well as the official transcriber for the September 8 hearing, did not hear what defendant's attorney represented was stated on the video, i.e., plaintiff saying she did not want to live.

More importantly, the judge indulged defendant's interpretation of what was said on the recording, stating, "let's assume [plaintiff] makes the statement to the paramedics, 'I don't want to live.' Now, why is that relevant to credibility? How does that defeat her . . . being credible." In response, defendant's attorney admitted the statement was "not in and of itself, . . . the end-all, be-all."

16

Additionally, even after the judge told defendant's attorney, "I don't think it was clear that she told the paramedics that statement," he assured counsel, "we can deal with that as an argument in this case." Given these circumstances and considering the extensive cross-examination conducted by defendant's attorney, we are not persuaded defendant was denied due process or that the judge's credibility determinations were tainted.

We next consider defendant's overlapping arguments the judge erred by failing to determine if there was a need for continuing restraints and neglecting to consider the factors outlined under N.J.S.A. 2C:25-29(a).

It is well established "[c]ommission of a predicate act is necessary, but alone insufficient, to trigger relief provided by the [PDVA]." R.G. v. R.G., 449 N.J. Super. 208, 228 (App. Div. 2017) (citing Silver, 387 N.J. Super. at 126-27). Although that determination "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6),[8] to protect the

---

[8] N.J.S.A. 2C:25-29 provides in part:

> The court shall consider but not be limited to the following factors:

victim from an immediate danger or to prevent further abuse."  Silver, 387 N.J. Super. at 127.  This "second [Silver] prong . . . requires the conduct [be] imbued by a desire to abuse or control the victim."  R.G., 449 N.J. Super. at 228 (citing Silver, 387 N.J. Super. at 126-27).  Whether a defendant's conduct was designed to abuse or control the plaintiff should be assessed in the context of the "entire relationship between the parties," Cesare, 154 N.J. at 405, so the court may look to other relevant factors not included in the statute, see N.T.B. v. D.D.B., 442 N.J. Super. 205, 223 (App. Div. 2015) (noting the statutory factors are "nonexclusive").

Here, plaintiff provided unrefuted testimony that during the marriage: she was not allowed to work without defendant's permission; defendant tracked her movements outside the home; and he remotely monitored her when she was

---

(1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
(2) The existence of immediate danger to person or property;
(3) The financial circumstances of the plaintiff and defendant;
(4) The best interests of the victim and any child;
(5) In determining custody and parenting time the protection of the victim's safety; and
(6) The existence of a verifiable order of protection from another jurisdiction.

18

inside the home, after installing cameras with "zoom-in capability." It also is uncontroverted that after the sexual assault occurred, defendant did not return plaintiff's keys, license, or purse to her, and for days thereafter, he demanded she be available to him to perform sexual acts he requested. Additionally, defendant did not deny he stayed in the parking lot "the whole time" she enjoyed parenting time with the children at a local diner after the parties separated; nor did he refute he left the marital home in disarray and "emptied out" the children's rooms after plaintiff was awarded primary physical custody and temporary possession of the home.

We are satisfied the judge did not ignore these undisputed facts and that he implicitly addressed the applicable statutory factors under N.J.S.A. 2C:25-29(a) before granting the FRO. For example, he considered plaintiff's best interests and those of her children when he continued plaintiff's status as the children's primary caretaker and fixed the parties' parenting time arrangements contemporaneous with the entry of the FRO. Also, after hearing plaintiff's unrefuted testimony that defendant controlled the parties' finances, it is evident the judge considered the parties' financial circumstances because he granted plaintiff possession of the former marital residence, compelled defendant to pay $300 per week in support, and directed him to satisfy the parties' monthly

19

mortgage payments, utilities, health insurance, car payment and car insurance obligations. Moreover, it is clear the judge recognized plaintiff's need for protection even before he issued the FRO because he directed a third party – not defendant – to return the children's personalty to the home, and he found defendant violated "the court's [temporary] order granting plaintiff custody."

Finally, we agree with the judge's conclusion that the sexual assault perpetrated by defendant was "an egregious act" warranting the issuance of the FRO. In fact, the sexual assault, as credibly described by plaintiff in significant detail, was so vicious that the need for a restraining order, as noted in Silver, 387 N.J. Super. at 127, was "perfunctory and self-evident." See S.K. v. J.H., 426 N.J. Super. 230, 233 (App. Div. 2012).

In sum, the trial court's factual findings regarding the predicate act are adequately supported by substantial, credible evidence in the record and considering plaintiff provided unrefuted testimony regarding the applicable statutory factors under the second Silver prong, we discern no basis to disturb the challenged FRO.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0441-21