# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1284-23

N.W.,[1]

    Plaintiff-Respondent,

v.

B.J.D.,

    Defendant-Appellant.

_____

Submitted November 14, 2024 – Decided January 10, 2025

Before Judges Marczyk and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FV-11-0176-24.

Davis Law Firm, LLC, attorney for appellant (Mark G. Davis, on the brief).

Central Jersey Legal Services, Inc., attorneys for respondent (Kalea T. Edmundo, La Tanya R. Harry and Daniel I. Rubin, on the brief).

---

[1] We use initials to protect the confidentiality of the victim in these proceedings. R. 1:38-3(d)(10).

PER CURIAM

Defendant B.J.D. appeals from the November 30, 2023 final restraining order (FRO) entered against him and in favor of plaintiff N.W. under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Defendant argues the trial court erred in finding plaintiff established the requisite predicate acts of domestic violence as required under Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Following a review of the record, the parties' arguments, and the applicable legal principles, we affirm.

I.

Plaintiff and defendant were involved in a dating relationship for approximately thirteen years, beginning in 2010 and ending in 2023, and shared one child in common. They lived together until July 25, 2023, when plaintiff claimed that after enduring a history of domestic violence, she attempted to end the relationship. She alleged that defendant made threats putting her in fear for her life and causing her to seek the restraining order that underpins this appeal.

Specifically, on July 26, 2023, plaintiff obtained a temporary restraining order (TRO) against defendant, after filing a complaint alleging predicate acts of domestic violence including harassment, N.J.S.A. 2C:33-4; terroristic threats,

A-1284-23

N.J.S.A. 2C:12-3; and false imprisonment, N.J.S.A. 2C:13-3.[2] Plaintiff thereafter amended her TRO to include additional prior incidents of domestic violence, specifically acts of sexual assault, and an additional predicate act of contempt, N.J.S.A. 2C:29-9.

The following facts were derived from the three-day hearing in late 2023 during which both plaintiff and defendant testified.

A. Predicate Acts of Domestic Violence

Plaintiff testified that on July 24, 2023, she was attempting to end her relationship with defendant and intended to stay with her brother that night. She informed defendant she was leaving that evening to afford him time with their child and his daughter from another relationship. In response, defendant prevented plaintiff from leaving their son's room by blocking the door.[3] Defendant ordered plaintiff to "sit on the bed" and "kicked the door shut" as plaintiff was "shaking [and] crying." Plaintiff recounted defendant threatening

---

[2] Defendant obtained a TRO against plaintiff, alleging criminal mischief, harassment, and cyber harassment, which the court later dismissed. Defendant did not appeal that order.

[3] Plaintiff argued before the trial court that defendant's act of preventing her from leaving their son's room established false imprisonment. The trial court ultimately rejected plaintiff's argument, finding plaintiff did not prove that offense by a preponderance of the evidence. This is not an issue raised on appeal.

"he would kill [her] before [she] ever left the relationship[,] [t]hat basically [she] was his property[] [a]nd even if [she] left . . . [she] wasn't done being with him." Defendant proceeded to threaten her, "I'm going to still keep coming over because we're going to keeping f[***]ing because that's my p[****] and it belongs to me." Plaintiff recalled "turn[ing her] back towards [defendant]" and pleading with defendant to "please just leave [her] alone."

Plaintiff eventually managed to leave the house to spend the evening at her brother's home, but "got [an] . . . eerie feeling" and became concerned when she learned defendant left their nine-year-old child alone with his daughter. Plaintiff returned to their home later that night to find the children alone and advised defendant via text messages that she wanted to end their relationship. Defendant sent plaintiff text messages asking her, "[w]hy do you want to be with me so bad?" which she did not understand. Plaintiff testified she stayed in their son's room that night.

The next day, plaintiff posted a message on Facebook stating defendant "sexually[,] . . . physically[,] . . . emotionally, mentally, and verbally abused" her and she "wanted it on record in case when [she] got [her] storage unit and [she] finally left . . . the house, . . . defendant made good on his threats to kill [her]."

According to plaintiff, that same morning, she began moving her belongings into a storage unit. Defendant called her twice demanding that she return home, and when plaintiff returned, defendant was waiting at the door and "grabbed [her] arm as [she] was walking in." Plaintiff ran into the bathroom as defendant continued to grab at her. Plaintiff testified defendant stated, "blood in and blood out. Death is the only way to leave this relationship," making her feel "[s]cared" that he would kill her because he previously told her that while physically attacking her. As defendant gripped her tighter, she said "get the f[***] off of me and . . . ran out the house," "jumped in [the] car," and drove away crying.

Plaintiff recalled returning with her sister-in-law to pack more of her belongings. As plaintiff was leaving with their son, defendant followed them shouting profanities. He yelled, "b[****], come in my f[***]ing face. Come in my f[***]ing face." When plaintiff questioned, "you're really going to talk to me like that while our son's right here?" defendant responded saying "b[****], f[***] you." Plaintiff brought their son, who was upset and crying, back inside the house to calm him down as defendant sat on the stairs with "his legs wide open and his hand on his hip where he usually has his gun," "glaring" at her.

5

Plaintiff testified she was "[t]errified, like he was about to attack [her]." She ultimately left the house and obtained the TRO.

Defendant disputed plaintiff's account, testifying that plaintiff and he were "discussing . . . the possibility of a breakup." Plaintiff left to remove some of her belongings from storage and when she returned later that day plaintiff "tried to take [an] iPad out of [defendant's] hand that belonged to [their] son." According to defendant, he released the iPad "to prevent any arguments" and plaintiff left the house and "started yelling . . . trying to incite . . . an argument" so he went back inside the house. Defendant admitted that at some point that day, he "tr[ied] to talk to [plaintiff], but she didn't want to talk" and he "followed her a couple of times" but "just let it go." Defendant testified that he never "physically stop[ped]" plaintiff from leaving.

Plaintiff testified "since the day [she] filed the [TRO] defendant ha[d] been looking at [her] on the Ring camera" at her home, explaining that she knew defendant was watching her through this surveillance device because a red light appeared indicating the camera was accessed remotely. Plaintiff claimed defendant activated the Ring camera on three dates after the TRO was entered. She took photographs of the camera when it was "in red view" to demonstrate its appearance.

6

Defendant explained that the light on the camera "turn[s] on whenever there's motion detected" and begins recording automatically. Defendant denied activating the Ring camera app to view live feeds of the camera and similarly denied accessing videos taken from the camera after the TRO was entered against him. No one testified that defendant had exclusive access to the device.

B. Prior Acts of Domestic Violence

Plaintiff argued that she needed protection from future harm based on the prior history of domestic abuse by defendant, including repeated acts of sexual assault beginning in August 2011. Specifically, plaintiff described an incident at plaintiff's house, while defendant's daughter was in the next room. Defendant "grabbed [plaintiff] by [her] neck, threw [her] on the bed, and put a knife to [her] neck and said fight [him] off as . . . [she] would fight somebody off [who was] trying to rape [her]." She recalled "pushing him off of [her]" as he was "laughing." Plaintiff testified that defendant "raped" her. He then laughed and "sat at the edge of the bed and . . . said[,] 'so that was your poor attempt of trying to fight me off. I see you're going to let anybody take this p[****] when I leave.'"

The following morning, plaintiff went to defendant's ex-wife's house to ask defendant to return her house key. When plaintiff entered the house and

7

asked defendant for her key, defendant punched plaintiff in the chest, "grabbed his gun and he put it to [her] head." Plaintiff attempted to escape, but defendant "grabbed [her], start[ed] kicking[,] . . . punching[,] . . . [and] stomping [on her] as [she] was on the ground yelling for help."

Defendant denied ever sexually assaulting plaintiff, insisting all contact was consensual. According to defendant, plaintiff had an argument with his ex-wife, and plaintiff followed defendant out of the house asking defendant for her house key. Defendant denied ever pointing a gun at plaintiff.

Plaintiff reported these incidents to police and received medical care at the hospital. Plaintiff's hospital records were entered into evidence and corroborated her testimony that she suffered an ankle injury, had contusions on her face, and "vaginal bruising consistent with sexual assault." Plaintiff testified defendant "turned himself in" following the incident. She filed a complaint seeking temporary restraints against defendant, but a week later, voluntarily dismissed the TRO "because [she] was afraid" of defendant.

Trenton Police Department Internal Affairs Unit and Ewing Township Police Department conducted investigations following the August 2011 incident, as both defendant and plaintiff are police officers. According to both plaintiff and defendant, plaintiff would no longer cooperate as a victim, so the

8

charges were dismissed. The two continued their dating relationship after plaintiff dismissed her TRO.

Plaintiff recalled another incident in December 2012 when defendant "kicked [her] in [the] chest with all his might" and continued to punch and kick her after she fell to the ground. Defendant took plaintiff to the hospital, but ordered plaintiff to tell the physicians that she injured herself while moving furniture. Hospital records confirmed plaintiff was treated at the hospital on December 23, 2012 and suffered cracked ribs. Plaintiff testified defendant attacked her two days later while she was lying in bed, punching and kicking her in her chest and face, causing her to "vomit[] uncontrollably." Plaintiff went to the hospital on her own, but told physicians "it was probably due to [her] ribs already being broken a few days prior." The hospital records pertaining to these incidents were entered into evidence. Defendant testified he did not recall any verbal or physical argument in December 2012.

Plaintiff testified she learned she was pregnant with her son in October 2013. She recalled an incident that occurred in May 2014, while still pregnant when the parties argued over plaintiff's baby shower. Defendant slapped her, "grabbed [her] by [her] throat and started punching [her] in [the] stomach and . . . face." Plaintiff attempted to escape and fell down the stairs. Defendant

refused to take plaintiff to the hospital, and plaintiff did not report the incident to police. Defendant denied having any argument or physical altercation with plaintiff in May 2014.

Plaintiff also described an argument she had with defendant in September 2018, after defendant asked that plaintiff do something for his ex-wife. When plaintiff later "expressed to . . . defendant that [she] felt it was disrespectful for him" to have requested plaintiff's help, defendant cursed at her and called her names before strangling her. She recalled defendant stating "blood in and blood out. The only way [she] leaves the relationship is death. And if [she] ever th[ought] [she] would leave him and get in a relationship with anybody else, he'd kill . . . both of [them]." Defendant testified that he had no recollection of that argument.

C. The Trial Court's Decision

On November 30, 2023, the trial court issued an oral decision and entered an FRO against defendant. At the outset the court found plaintiff credible, noting she was "poised, even though at times very emotional, but even when emotional not overly dramatic." The court noted that "in [its] view [plaintiff was] so terrified she would not even look in the direction of . . . defendant on the witness stand" and "became emotional during difficult questions, especially

when she had to recount her rape." On the other hand, the court did not find defendant credible in his "blanket denial[s]," noting defendant "essentially denied the allegations after very specific singular questions."

The court reviewed the evidence, including the hospital records and plaintiff's testimony supporting her claims of a prior history of domestic violence.

The court found plaintiff established the predicate act of terroristic threats, citing the history "replete with physical and sexual assaults that [d]efendant proved to be capable of" and noting the "expression that blood in, blood out, you're not leaving me or I'll kill you" was "a serious expression to commit an act of violence" considering the prior history between the parties. The court found plaintiff was "fearful of . . . defendant," and was in "immediate danger."

The court was likewise "satisfied . . . [p]laintiff . . . established by a preponderance of the credible evidence the predicate act of harassment by way of the threats under [N.J.S.A. 2C:33-4(a)] . . . [and] [h]arassment under [N.J.S.A. 2C:33-4(b)], the grabbing of her arm, the squeezing of her wrists."

The court also found plaintiff established the predicate act of contempt, accepting plaintiff's testimony as true that the red light on the Ring camera indicated that defendant was "observ[ing] her on those particular dates." The

court reasoned that defendant "was the only one who had access" and deemed his surveillance via the Ring camera as contempt of the TRO.

The court determined plaintiff was in need of future protection, reasoning "the predicate acts [were] tainted by a desire to continue to abuse or control" plaintiff.

## II.

From this determination, defendant now appeals. He confines his arguments to claiming the court erred in finding plaintiff presented sufficient evidence of any of the three predicate acts of harassment, contempt, or terroristic threats.

## III.

An appellate court's review of an FRO is generally limited. See C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" Ibid. (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)); see also S.K. v. J.H., 426 N.J. Super. 230, 238 (App. Div. 2012). The appellate court may review the FRO record to

determine whether the record as a whole supports issuance of the FRO. See J.D., 207 N.J. at 488.

Findings by a court "are binding on appeal when supported by adequate, substantial, credible evidence." T.M.S. v. W.C.P., 450 N.J. Super. 499, 502 (App. Div. 2017) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). This court does not disturb a trial court's findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). An appellate court's review of legal conclusions is de novo. See C.C., 463 N.J. Super. at 428-29.

When determining whether to issue an FRO pursuant to the PDVA, trial courts must engage in a two-step analysis. See Silver, 387 N.J. Super. at 125-27. The trial court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. This determination is made "in light of the previous history of violence between the parties." Ibid. (quoting Cesare, 154 N.J. at 402). Upon a finding of a predicate act of domestic violence, the court must then determine whether an FRO is required to protect

13

the party seeking restraints from future acts or threats of violence. Id. at 126-27. "[T]here [must] be a finding that 'relief is necessary to prevent further abuse.'" J.D., 207 N.J. at 476 (quoting N.J.S.A. 2C:25-29(b)).

We first address defendant's challenge to the court's finding defendant committed the predicate act of terroristic threats. A person commits a terroristic threat "if he threatens to commit any crime of violence with the purpose to terrorize another . . . or in reckless disregard of the risk of causing such terror or inconvenience," N.J.S.A. 2C:12-3(a), or "threatens to kill another with the purpose to put [that person] in imminent fear of death under circumstances reasonably causing the victim to believe the immediacy of the threat and likelihood that it will be carried out," N.J.S.A. 2C:12-3(b).

Proof of a terroristic threat must be evaluated by an objective standard of review. See State v. Smith, 262 N.J. Super. 487, 515 (App. Div. 1993). "The pertinent requirements [in evaluating an alleged terroristic threat] are whether: (1) the defendant in fact threatened the plaintiff; (2) the defendant intended to so threaten the plaintiff; [and] (3) a reasonable person would have believed the threat." Cesare, 154 N.J. at 402.

Despite his denials and alleged inability to recall past events at trial, defendant now argues that the record "lack[ed] sufficient evidence that [he]

14

uttered the subject words with an intended purpose of threatening [p]laintiff." Defendant claims his statements were made in a "heated, passionate discourse concerning the salvageability of their [thirteen]-year relationship[] and [d]efendant was expressing anything he could to convey the seriousness of his commitment to repairing their relationship."

The trial court expressly found, after weighing the evidence and finding plaintiff's testimony credible and defendant's denials not believable, that the "expression . . . blood in, blood out, you're not leaving me or I'll kill you" was "a serious expression to commit an act of violence," particularly considering the prior history between the parties.

Defendant asserts "[n]ot only would a reasonable person have failed to believe that threat, given the totality of surrounding circumstances, . . . neither did plaintiff." We disagree.

The court credited plaintiff's testimony that she was "scared" that defendant was going to kill her because she was finally moving out and deemed her belief objectively reasonable given the history of domestic violence and defendant's prior use of that terminology when he assaulted her. We see no basis to disturb that conclusion which was rooted in detailed testimony and evidence including medical records related to prior violent attacks. Although defendant

15

does not challenge the second requirement, we also concur with the court's finding that the FRO was necessary to protect plaintiff from future harm.

Because the proper determination of the predicate act of terroristic threats and future risk of continued abuse justified the entry of the FRO, our review of the harassment and contempt findings are, practically speaking, of no moment as the restraints will stand regardless. A plaintiff need establish only a single predicate act. See Cesare, 154 N.J. at 402.

Nevertheless, we briefly address defendant's argument concerning the predicate act of harassment and concur with the court's conclusion that plaintiff proved harassment under N.J.S.A. 2C:33-4(a) and (b).

To establish harassment under N.J.S.A. 2C:33-4, a person must act "with purpose to harass another" when that person:

> [(a)] Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> [(b)] Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> [(c)] Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

16

Intent to harass is often difficult to prove, so "'purpose may and often must be inferred from what is said and done and the surrounding circumstances[,]' and '[p]rior conduct and statements may be relevant to and support an inference of purpose.'" R.G. v. R.G., 449 N.J. Super. 208, 226 (App. Div. 2017) (alterations in original) (quoting State v. Castagna, 387 N.J. Super. 598, 606 (App. Div. 2006)). A "'finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience." H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003) (quoting State v. Hoffman, 149 N.J. 564, 577 (1997)).

The court found plaintiff established by a preponderance of the evidence the offense of harassment under N.J.S.A. 2C:33-4(a) because of the offensive and alarming language defendant directed towards her and under N.J.S.A. 2C:33-4(b) when defendant grabbed her arm and squeezed her wrist. We see no reason to disturb the court's decision as the purpose to harass can be readily inferred from the testimony, particularly taken in conjunction with the parties' prior history.

Finding sufficient support for both terroristic threats and harassment, each independently anchoring the FRO, we need not address defendant's arguments or analyze the court's finding of contempt, N.J.S.A. 2C:29-9. See Cesare, 154 N.J. at 402.

17

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1284-23