# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4143-23

J.D.D.,[1]

    Plaintiff-Respondent,

v.

N.R.A.,

    Defendant-Appellant.

_____

Submitted September 10, 2025 – Decided September 30, 2025

Before Judges Gooden Brown and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FV-02-2809-24.

Sherwood, Johnson, & Poles, LLC, attorneys for appellant (Marc J. Poles and Matthew J. Dourdis, on the brief).

Respondent has not filed a brief.

---

[1] We use initials to protect the domestic violence victim's privacy and the confidentiality of these proceedings. R. 1:38-3(d)(10).

PER CURIAM

Defendant, N.R.A., appeals from the July 16, 2024 final restraining order (FRO) entered against him and in favor of plaintiff, J.D.D., under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.  After a review of the record and applicable legal principles, we affirm.

I.

A. Background and Pre-Trial Proceedings

Plaintiff ended her romantic relationship with defendant and asked that he move out of their residence in late April 2024.  Alarmed by what she described as defendant's increasingly "aggressive" and "erratic" behavior, plaintiff obtained a temporary restraining order (TRO) against him on June 7, 2024, alleging predicate acts of harassment, N.J.S.A. 2C:33-4, and criminal coercion, N.J.S.A. 2C:13-5.  She amended the TRO less than two weeks later, incorporating additional information regarding defendant's alarming behavior. She alleged in part that he followed her, refused to leave the house, abused her verbally in messages and texts, told her he was hearing voices and subliminal messages in music, and threatened he would never let her see other men and would burn her clothes and kill himself if she made him move out, citing specific incidents.

A-4143-23

Defendant appeared without counsel at the first hearing date of June 17, 2024. The court explained defendant had a right to an attorney and would entertain an adjournment request to allow defendant to consult with counsel. The court emphasized that at the next court appearance defendant could either consent to the entry of the FRO or "the matter [would] be set down for trial." Defendant then indicated he "w[ould] be obtaining [an] attorney," and requested an adjournment. The court granted an adjournment, set the trial for June 27, 2024, at 10:30 a.m., expressly directed that, by that date, "both parties shall have all witnesses and evidence ready to present in furtherance of the respective positions of the parties," and told defendant, "you and your attorney, if you get one, will come to my courtroom."

On June 24, 2024, newly retained defense counsel entered an appearance and sought another adjournment of the trial date, which the court granted. The continuance order expressly advised the FRO trial was adjourned to July 16, at 10:30 a.m.

Significantly, defendant does not dispute that he hired counsel for the limited purpose of pursuing resolution by civil restraints. When no resolution resulted, defense counsel terminated representation, as she was not retained to try the FRO matter.

3

B.  The FRO Hearing

1. Defendant's Failure to Appear and Defense Counsel's Withdrawal

Neither counsel nor defendant appeared at the time of the hearing on July 16, 2024, and the court reached out to both.  Defendant's counsel advised that her representation ended and emailed the court at 12:54 p.m. on the day of the hearing, copying plaintiff's counsel, informing the court that defendant "said he [wa]s on his way," and asking the court to present defendant with the written substitution of counsel attached for signature by defendant.  Defendant's counsel represented in her email that she "encouraged [defendant] yet again to sign the [c]onsent [o]rder that [she] was retained to negotiate with [plaintiff's counsel]."[2]

Hours passed and defendant failed to appear despite indicating he was on his way.  The court began the FRO proceeding stating its understanding that defendant retained counsel "for purposes of drafting and reviewing a consent order only."  The court added it reached out to the attorney who explained defendant "refused to sign it and she was no longer involved in this case."

The court further explained its contacts with defendant:

> [Defendant] was reached out to by my chambers and asked if he wished to proceed.  He thought the matter was not going to proceed today, and was unaware of the

---

[2]  Defendant's brief represents that counsel "discontinued her services with [d]efendant" "on the eve of trial on July 15, 2024, at approximately 4:05 p.m."

A-4143-23

time that it started.  He was told that the matter would proceed. . . .  [T]he matter was scheduled for 10:30 in the morning.  It is now [thirty-three] minutes after 2:00 on July 16[], 2024, with [] defendant still not here.  The last contact we had with [defendant] was at 2:20—[twenty] minutes after 2:00, and he said that his GPS said that he was going to be here in eight minutes.  It is now [twelve] minutes after that time, and he is still not here.  He has not further updated as to when he is going to appear or not.

So, [plaintiff's c]ounsel, I'm prepared to move forward.  If he appears, I'm going to allow him to participate at that point, but I'm not going to make you duplicate your efforts at that point, because he has failed to appear at this point in time, and the matter is significantly later than the assigned time.

Plaintiff presented her friend, Dr. Dominic Canova, as her first witness, and he completed his brief testimony in defendant's absence.  Then, as plaintiff began testifying, defendant arrived to court at 2:53 p.m.  The court indicated defendant was ordered to appear at 10:30 a.m., and engaged in the following exchange with defendant:

THE COURT:  . . . We spoke with . . . [your attorney], who stated that she was retained for the purposes of drafting or reviewing and entering into a consent agreement, a civil restraints agreement,—

[DEFENDANT]:  Yes.

THE COURT:  —and that you refused to enter into it, and that's fine.  That was the extent of her involvement.  So she was not appearing here today.

5

[DEFENDANT]:  Understood.

THE COURT:  Okay.  And . . . she's withdrawing, and there's an area for you to sign.

[DEFENDANT]:  Okay.

THE COURT:  You're going to sign that, sir?

[DEFENDANT]:  Sure.

THE COURT:  So you'll be representing yourself. Again, as stated, the trial began already, because I think at [twenty] minutes after 2:00 [p.m.], you said, [w]e're eight minutes away.  We waited [twelve] minutes.  You did not appear.  So I was compelled to begin the trial. You understand that?

[DEFENDANT]:  Absolutely.  Absolutely.  I was lost. I was lost all over.

THE COURT:  Okay.  The first witness was Dr. [] Canova.

[DEFENDANT]:  Okay.

THE COURT:  He's already testified.

[DEFENDANT]:  Okay.

The court instructed defendant that plaintiff would testify, defendant would be permitted to cross-examine her, and that he would then have the opportunity to testify.  In response, defendant stated:

> No questions.  I know this is outrageous—a miscommunication, and I understand that any kind of

adjournment or any kind of anything would not, you know, even be possible. But you know, the reason why we didn't enter into the civil restraints was there was no real movement . . . as far as the parameters. And I was under the interpretation that [my former attorney] understood that. And, yes, . . . just yesterday and last night at the [eleventh] hour, this and that, and I just signed up at 11:30 [a.m.] I called yesterday immediately and said, can I ask for an adjournment. They said, go online. I went online today at 11:30 [a.m.] and I called [my former attorney] to say can you please do it, because I can't figure it out? And she said, it's today.

So I mean, clearly, look at me. I'm a mess. I'm sweating. I'm moving from an Airbnb. I'm not dressed appropriately.

The court indicated this was a "summary proceeding[]" that "need[ed] to happen quickly," and the hearing was "significantly over the due date." It explained defendant "ha[s] rights," and indicated it understood defendant "[was]n't aware that the matter was proceeding today," but "plaintiff has rights too." The court confirmed defendant did not reconsider entering into a civil restraints agreement and continued with plaintiff's testimony.

2. <u>The Hearing Testimony and Evidence</u>

Before defendant's arrival, Dr. Canova had testified defendant contacted him via telephone, text, and social media on June 11, 2024, attempting to get him to contact plaintiff on defendant's behalf. Plaintiff played recordings of

7

multiple voice messages defendant left on June 11, 2024, in which defendant repeatedly stated plaintiff "ha[d] done some things that will . . . jeopardize her career" and had been "psychiatric the last couple months." Defendant stated he knew about "the utmost important legal matter" regarding plaintiff, which "will spell the end of [plaintiff]'s career," insisting, "I know your ass is not sleeping. You hear the frigging phone ringing." His texts contained similar content, with one stating, "I left you a message. If you're in bed sleeping, if you're f[***]ing, whatever you're doing, I need your attention." Defendant indicated he would come to Dr. Canova's house, and Dr. Canova "blocked [defendant's] number" and filed a report with police.

Plaintiff then began to testify in accordance with her complaint, describing that she had been in a relationship for years when defendant's erratic behavior became increasingly concerning in April 2024. She recalled defendant "started to say that he was hearing . . . buzzing in his head, and he was . . . irritable." She indicated defendant's "mental health began to deteriorate," and she was "frightened because he was trying to get into [her] bedroom at night" despite her ending the relationship. Plaintiff testified the "strange" behavior escalated such that "[d]uring one of his rants to [her around June 5, 2024], he took a cord and wrapped it around his neck and stated that he

8

wanted to kill himself because of [her]," scaring and alarming her. She testified she "believe[d] that when he was removed from [her] home, he put . . . [an] iPad under [her] sofa" and came to retrieve the device the following week and indicated he recorded conversations between her and her daughter, who lived with plaintiff.

It was at this point in plaintiff's testimony that defendant appeared, after which plaintiff continued her testimony and was subject to cross-examination by defendant. Plaintiff recounted defendant's concerning behaviors prompted her to break up with defendant. She explained he resisted the separation and remained in the residence with plaintiff even after informing her he found a new place to live starting June 1, 2024. She claimed defendant told her "he was hearing subliminal messages in music" and that he spoke with plaintiff's daughter about the parties' sex life. He told her he would "move into [her] basement[,] . . . that [they would] . . . continue [their] relationship, and there's not much that [she was] going to be able to do about that."

She described defendant "exhibiting sexually aggressive behavior," indicating she and defendant were sleeping in separate rooms, yet he still entered her bedroom attempting to have sex with her. She described the night of May 31, 2024, around 11:30 p.m., when defendant entered her room "smelling of

A-4143-23

alcohol[,] stating that he[ was] requesting [her] vibrator, [and] that he was in [her] underwear drawer." He claimed he was "sniffing" these items and they were "dirty," and "how dare [she] be with other people." Plaintiff testified defendant refused to leave the room when she asked, followed her downstairs, and "continu[ed] to rant" for "about an hour" before she retreated to her bedroom and locked the door, after which defendant continued texting her for "the next two or three hours."

Plaintiff testified that in late May she discovered that defendant was using drugs after receiving a text from him that he would be staying at a hotel room because he "needed to come off of the drugs." Plaintiff presented a text message from June 6, 2024, from defendant, which she indicated was consistent with the "incoherent and rambling" messages, referencing his drug use and stating, "[A]t least I knowingly do bad s[***] to catch myself. Be mindful of that line not to cross. You do bad s[***]. Think it's normal. No regard to other people and don't look inward to admit it."

Plaintiff also indicated on June 4, defendant "threaten[ed] to burn [her] clothes," specifically her underwear and vibrator, and sent a message stating, "I feel like burning all your new f[***]ing panties." Plaintiff responded that defendant needed to leave, but defendant answered, "you're going to start loving

10

to put c[**] on your face again. Used to love that s[***] before, and then it became an issue with me." She testified that two days later defendant "threw up [her] nightgown and said, 'Oh, are you shaved?'" and indicated that he was hearing voices. She testified that defendant sent her two packages from Amazon after the TRO was issued, but the court sua sponte indicated it would not consider that information as it had not been included in either the initial or the amended complaint.

Plaintiff explained defendant contacted her friends and family after the TRO had been issued. Plaintiff described messages defendant sent to his brother, in which defendant requested he contact the plaintiff on his behalf, informed him that he recorded plaintiff, "heard [her] say some things, and he was threatening to use it against [her] to ruin [her] career." She recalled that he made the threat "and he said that [she was] to contact him and drop this case." Plaintiff introduced a screenshot of this message. She testified defendant's behaviors caused her to fear him, and she blocked his phone number, but he persisted in contacting her. Plaintiff indicated she felt she needed a restraining order to protect herself from defendant and felt "scared for [her] safety."

Defendant cross-examined plaintiff, and plaintiff confirmed the incident in which she claimed defendant entered her room drunk and aggressive and demanded she turn over her vibrator.

Defendant then elected to testify and described the same incident. He testified he was simply putting away clothes and saw one vibrator he had purchased for plaintiff, but another was missing. He admitted the two "got into a little exchange," and later that night defendant "had a drink to work up the courage to ask her for the vibrator." He explained he asked her for the vibrator and told her she should not be using it with anyone else. Defendant claimed he defended himself for the next five minutes before being thrown out of plaintiff's room. He testified plaintiff came downstairs to speak with him and any messages he sent her that night "w[ere] more of a joke." He claimed his entering her room "was a nightly occurrence," and her door was typically unlocked.

He admitted that he heard a song that caused him to think he needed to speak to plaintiff about their relationship, but denied hearing voices. He admitted to saying he "wanted to burn her panties," explaining he "was jealous," but never considered burning them or lifted up plaintiff's nightgown. He said his comments were "a figure of speech" as the two "sa[id] silly things like that."

12

He also admitted setting up his iPad to record plaintiff, but claimed he left the device "recording inadvertently."

He denied ever speaking to plaintiff's daughter about the parties' sex life or that he threatened to kill himself. He denied using social media, yet admitted to using social media to "reach out to several people to get them to contact [plaintiff]." Defendant testified he did send gifts to plaintiff through Amazon.

3. The Court's Decision

The court then rendered an oral decision and granted the FRO. Assessing credibility, the court found "plaintiff's testimony was [] credible and accurate based on the testimony that[ was] presented, as well as the evidence that was presented." The court found plaintiff maintained eye contact and appeared concerned and upset "regarding the actions of [] defendant." Conversely, the court explained "defendant's testimony . . . rais[ed] some concern[,]" finding it "meandering," "at times incoherent," and not "reasonable," noting "plaintiff's testimony [wa]s far more reasonable." The court determined defendant's testimony "lacked candor and was evasive," at times "completely contradicting his own testimony and . . . the evidence that was presented." The court cited defendant's reluctance to answer plaintiff's counsel's questions, and concluded defendant's testimony was not believable.

A-4143-23

Although the court stated it was "not sure [it] g[ot] the criminal coercion predicate act," the court found "clearly harassment ha[d] been established." Therefore, the court found "plaintiff has proven by a preponderance of the evidence that [] defendant did commit . . . acts of harassment against [] plaintiff." The court recognized it "may glean intentional harassment from the attendant circumstances," citing C.M.F. v. R.G.F., 418 N.J. Super. 396 (App. Div. 2011), and found the acts plaintiff alleged defendant performed in fact "occurred, including threatening to burn her property, going into her room on numerous occasions, having hostile and harassing communications with [] plaintiff."

It found "there[ was] a substantial amount of credible testimony by [] plaintiff, including his attempt[,] by his admission[,] to get her vibrator, to burn her property, and that he was often ranting to her about not going to have the house to herself." Further, despite plaintiff's telling him to leave, "defendant told [her] that he would not allow her to date anyone else," determining this "invasive testimony, not only here, but throughout the relationship, caused [] plaintiff to be concerned for her life, health, and safety." It acknowledged defendant's "verbally abusive" language and threats in phone messages and texts, and credited plaintiff's testimony that defendant wanted to remain in the

14

relationship despite plaintiff's request for defendant to leave. The court expressed "concern[] regarding [defendant's] stability," referencing his "hearing voices in the house, which [it] . . . [found] credible."

The court found that these behaviors as well as defendant's "admit[ting] to contacting plaintiff's family and friends in an effort to have them contact plaintiff" after the TRO was entered were "reflective of the need for a restraining order." The court also cited defendant's sending Amazon packages to plaintiff and noted Dr. Canova's testimony regarding defendant's "disturbing contact" to be "emblematic of his behavior."

It recognized a prior history of domestic violence and found plaintiff was "subjected to . . . potential abusive and controlling behavior as [it] relates to their domestic relationship[, t]he offense was tainted by a desire to abuse and control the victim[,] . . . [and h]e acted erratically and abusively." Thus, the court determined "there is the existence of immediate danger to [] plaintiff and the best interest[s] of [] plaintiff are supported by the entry of a restraining order" for her protection.

## II.

Defendant appeals, arguing that various procedural errors deprived him of due process. He asserts the court erred in: (1) allowing withdrawal of counsel

15

and not explaining to defendant the ramifications of signing the substitution of counsel; (2) failing to afford a brief adjournment to allow him to secure new counsel; (3) proceeding with the trial without allowing defendant a brief recess to review Dr. Canova's testimony or affording an opportunity to cross-examine; and (4) improperly instructing defendant regarding the trial proceedings and his rights. He also raises substantive challenges, arguing the court erred in finding plaintiff proved the predicate act of harassment as there was no evidence supporting defendant's intent to harass and the court improperly considered defendant's use of profanity to establish harassment and incorrectly determined that an FRO was necessary to protect plaintiff from future harm without considering all factors set forth in N.J.S.A. 2C:25-29(a).

## III.

### A.

We first address and reject defendant's procedural challenges. It is well-settled that our review of an FRO after a trial is generally limited. See C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" Ibid. (quoting J.D. v.

M.D.F., 207 N.J. 458, 482 (2011)); see also S.K. v. J.H., 426 N.J. Super. 230, 238 (App. Div. 2012). The appellate court may review the FRO record to determine whether the record as a whole supports the issuance of the FRO. See J.D., 207 N.J. at 488.

Findings by the trial court "are binding on appeal when supported by adequate, substantial, credible evidence." T.M.S. v. W.C.P., 450 N.J. Super. 499, 502 (App. Div. 2017) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). This court does not disturb a trial court's findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). By contrast, an appellate court's review of legal conclusions is de novo. See C.C., 463 N.J. Super. at 428-29.

Likewise, "[t]rial courts are granted considerable latitude in scheduling their proceedings," and this court will generally defer to those decisions "unless it represents a misapplication of discretion." State in the Int. of Z.S., 464 N.J. Super. 507, 547 (App. Div. 2020). "Whether there was an abuse of discretion depends on the amount of prejudice suffered by the aggrieved party." Escobar-Barrera v. Kissin, 464 N.J. Super. 224, 233 (App. Div. 2020). "Thus, refusal to

grant an adjournment will not lead to reversal 'unless an injustice has been done.'" Ibid. (quoting Nadel v. Bergamo, 160 N.J. Super. 213, 218 (App. Div. 1978)).

Similarly, "[t]he determination of whether the motion for substitution of counsel should be granted is within the discretion of the trial judge." State v. Kates, 426 N.J. Super. 32, 45 (App. Div. 2012) (quoting State v. Ortisi, 308 N.J. Super. 573, 588 (App. Div. 1988)). "When deciding whether to permit withdrawal, the trial court must balance its inherent and necessary right to control its own calendar and the public's interest in the orderly administration of justice against the attorney's reasons for requesting withdrawal." State v. Johnson, 247 N.J. Super. 137,147-48 (App. Div. 1994).

"[O]rdinary due process protections apply in the domestic violence context, notwithstanding the shortened time frames for conducting a final hearing." J.D., 207 N.J. at 478; see N.J.S.A. 2C:25-29(a). "[E]nsuring that defendants are not deprived of their due process rights requires our trial courts to recognize both what those rights are and how they can be protected consistent with the protective goals of the Act." J.D., 207 N.J. at 479. In PDVA matters, this requires "a defendant understand[] that he or she has a right to retain legal counsel and receive[] a reasonable opportunity to retain an attorney." A.A.R. v.

J.R.C., 471 N.J. Super. 584, 588 (App. Div. 2022).  Courts are thus empowered to grant continuances when "compliance with the ten-day provision precludes meaningful notice and an opportunity to defend." H.E.S. v. J.C.S., 175 N.J. 309, 323 (2003).  In such instances, "the provision must yield to due process requirements." Ibid.

Applying these principles in these specific circumstances, we are not persuaded that the court erred in allowing counsel's withdrawal or denying a third adjournment to allow defendant to retain a new attorney.  The initial TRO was issued and served on defendant personally on June 7, 2024, advising defendant he would have to appear for a final hearing on June 17.  He appeared, the court advised him of his rights, including the right to an attorney, and granted defendant an adjournment of the FRO trial to June 26 to retain counsel.  The court advised defendant to have his witnesses there and be prepared to proceed, with or without an attorney, upon return.  Thus, he was afforded the opportunity to retain counsel and prepare a defense.

Defendant then elected to retain counsel for the sole purpose of negotiating a possible resolution through civil restraints.  At defense counsel's request on defendant's behalf, the court again adjourned the trial date to July 16.  Defendant's brief on appeal confirms that all defendant's efforts prior to trial

were devoted to resolving the matter rather than trial preparation.

Defendant now criticizes counsel for "abandoning him" on the eve of trial. We do not probe the relationship between attorney and client or what occurred between them; that is not before us. We note, however, that defendant never made that claim to the court. Instead, when the court made inquiry of defendant's position, defendant confirmed that he understood counsel's limited representation of him, which did not include the trial. Accordingly, we discern no constitutional deprivation in the court's accepting counsel's withdrawal from the case.

To the extent defendant now challenges the manner in which counsel submitted the half-executed written substitution of counsel to the court, which the court then presented to defendant on the record, we do not perceive that occurrence as impacting our determination of whether counsel's withdrawal was improvidently granted. The court at the first proceeding advised defendant of his rights. Defendant was afforded the right to an attorney and never engaged an attorney to try the case. In these circumstances, we discern no obligation on the part of the court to probe further into counsel's performance or warn against signing the document, particularly after defendant confirmed he wished to sign it and understood counsel no longer represented him.

20

Defendant further contends "the parties had been focusing their efforts on coming to a resolution by way of a [c]ivil [r]estraints" agreement, and because defendant retained counsel for this purpose but the agreement never materialized, defendant "should have been afforded the opportunity to seek counsel for trial." We disagree.

In totality, defendant was granted a month from his initial hearing date to prepare for trial after being advised of his rights and was on notice of the hearing for weeks longer than that. Significantly, defendant then failed to appear at 10:30 a.m. for his scheduled trial, and apparently only after the court contacted defendant at least twice, arrived minutes before 3 p.m. Accepting as true that defendant attempted to seek an adjournment but was unable to electronically file the request, he offered no excuse for failing to appear as scheduled.

As to the claim that the court deprived defendant of the opportunity to cross-examine Dr. Canova, we recognize defendant's due process right to confront and question witnesses and note the important role cross-examination plays in domestic violence cases. See J.D., 207 N.J. at 458. However, review of the circumstances surrounding due process questions "are often fact[ ] sensitive." D.N. v. K.M., 429 N.J. Super. 592, 606 (2013).

Here, we acknowledge the court could have permitted defendant the

opportunity to review the brief testimony of Dr. Canova and advise defendant he could recall that witness if he chose to do so. However, we cannot view this alleged error in a vacuum, devoid of the contextual events precipitating the court's ruling. Defendant failed to appear for his trial after being granted two adjournments. The court then proactively roused defendant who eventually appeared nearly five hours late, after the court had commenced the trial presuming defendant would not appear as the close of the day approached. In short, the missed opportunity to cross-examine Dr. Canova flowed largely from defendant's own conduct.

Further, our review of the court's decision satisfies us that any error was harmless, and not of "such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. This does not devalue the significance of cross-examination, particularly as it impacts credibility determinations in domestic violence cases. Here, however, the trial court's decision turned almost entirely on the relative assessment of plaintiff's and defendant's testimony, and the exhibits depicting defendant's communications.

The extent of the court's brief mention of Dr. Canova's testimony was to note defendant's contacting him to intervene with plaintiff on his behalf. In many ways the exhibits reflecting the messages spoke for themselves, and the

court quoted from the message, not the testimony.

Further, this testimony was largely cumulative, as plaintiff testified that defendant contacted her friends and family, and defendant was able to cross-examine her on those contacts. The court cited defendant's own testimony regarding his brother's contacting plaintiff, and evidence and text messages confirming defendant recruited others to contact plaintiff. Thus, we do not deem any arguable error capable of having produced an unjust result.

B.

We next address the substantive arguments that the court erroneously found the predicate act of harassment and the need for a FRO to protect plaintiff.

Trial courts must engage in a two-step analysis to determine whether to issue an FRO. See Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). "First, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)). The court must make this determination "in light of the previous history of violence between the parties." Ibid. (quoting Cesare, 154 N.J. at 402).

Second, "upon a finding of the commission of a predicate act of domestic violence, . . . [the court must determine] whether [it] should enter a restraining

order that provides protection for the victim." Id. at 126. The guiding principle is "whether a restraining order i[s] necessary . . . to protect the victim from an immediate danger or to prevent further abuse." Id. at 127 (citing N.J.S.A. 2C:25-29(b)). The factors bearing upon this determination, include, but are not limited to those set forth in N.J.S.A. 2C:25-29(a)(1) to (6):

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety; and
>
> (6) The existence of a verifiable order of protection from another jurisdiction.

Here, the court found plaintiff established the predicate act of harassment. N.J.S.A. 2C:33-4 defines harassment as follows:

> [A] person commits a petty disorderly persons offense if, with purpose to harass another, he:
>
> > a. Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in

24

offensively coarse language, or any other manner likely to cause annoyance or alarm;

b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

Ultimately, courts "must consider the totality of the circumstances to determine whether the harassment statute has been violated." Cesare, 154 N.J. at 404 (citing State v. Hoffman, 149 N.J. 564, 584-85 (1997)). "[T]he decision about whether a particular series of events rises to the level of harassment or not is fact[ ]sensitive." J.D., 207 N.J. at 484. Under N.J.S.A. 2C:33-4, a purpose to harass is integral to a finding of the predicate act of harassment. See id. at 486-87; see also State v. Castagna, 387 N.J. Super. 598, 606 (App. Div. 2006). "'[A] finding of a purpose to harass may be inferred from the evidence presented,' and . . . '[c]ommon sense and experience may inform that determination.'" J.D., 207 N.J. at 477 (fourth alteration in original) (quoting Hoffman, 149 N.J. 564 at 577).

The court correctly applied the law to the record and found defendant's behavior constituted harassment. We note the court referenced defendant's

language and the content of his communications, but we reject defendant's claim that the court placed undue emphasis on his use of profanity. The court anchored its determination in proper considerations, describing in detail its reasoning and citing to the record.

Importantly, the court credited plaintiff's account of events and disbelieved defendant. It itemized the conduct and found defendant's actions and communications in the aggregate amounted to harassment. We defer to that determination, and the court's finding that defendant's conduct was intended to harass, which was grounded in substantial credible evidence in the record. Deference to a court's findings is "especially appropriate" when the evidence is largely testimonial and involves questions of credibility. In re D.L.B., 468 N.J. Super. 397, 416 (App. Div. 2021) (quoting Cesare, 154 N.J. at 412).

Here, the court also amply supported its conclusion that an FRO was necessary to protect plaintiff. The record included defendant's refusal to leave the residence, recording plaintiff, enlisting her friends and relatives to intercede, threatening to kill himself if she ended the relationship. The court cited "the history between the parties," defendant's conduct and threats, his entering plaintiff's room, and general hostility towards her in his communications, as "subject[ing platintiff] to [his] . . . potential . . . abusive and controlling

behavior" warranting permanent restraints.[3]   The court noted defendant continued the concerning behavior despite the TRO, further amplifying the need for further protection.   Accordingly, we see no grounds to disturb the entry of the FRO.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

---

[3]   We reject defendant's claim that the court's reference to defendant's sending Amazon packages was improper because that conduct was not listed in the complaint, as defendant offered that information during his own testimony despite the court's excluding it during plaintiff's case.

A-4143-23